**GULF, COLORADO & SANTA FE RAILROAD COMPANY, Appellant,**

v.

**R. A. PARMER, Appellee.**

No. 6730.

Court of Civil Appeals of Texas.

Beaumont.

March 25, 1965.

Rehearing Denied April 31, 1965.

Chilton O'Brien, Beaumont, for appellant.

Darden, Fowler & Creighton, Conroe, for appellee.

STEPHENSON, Justice.

This is an action for damages resulting from a collision between a bus and a train. Trial was by jury and judgment was rendered for plaintiff, the owner and driver of the bus. The parties will be referred to here as they were in the trial court.

■ The jury found the crossing involved was "extra-hazardous" and that defendant was negligent in not having a flagman, which was a proximate cause of the collision. Defendant contends there was no evidence to support these jury findings, that there was insufficient evidence, and that such findings were contrary to the weight and preponderance of the evidence. Considering first the no evidence points, we look only to the evidence favorable to such jury finding.

■ We are aware of the general rule that unless there is an extra-hazardous crossing, the lawful presence of the train at the crossing is sufficient warning in itself to warn travelers on the highway approaching in a prudent manner. We must view the situation as it existed on the night of the collision in order to determine whether or not this crossing was extra-hazardous. This law was recently restated by the Supreme Court in Fort Worth & Denver Railway Company v. Williams (Tex.1964) 375 S.W.2d 279. A railroad crossing may present no undue danger at one time, while at another it may be extra-hazardous. The degree of danger involved depends on the circumstances existing at the time of the accident. This Williams case, supra, quotes Tisdale v. Panhandle & S. F. Ry. Co. (Tex. Com.App.1921) 228 S.W. 133, 16 A.L.R. 1264, as follows:

"A flagman might not be required under the law at a certain crossing at one time, and yet it might be negligence to fail to provide one there at another time. The sole question for determination is whether or not at the time of the accident the conditions surrounding

the crossing in question rendered it more than ordinarily hazardous or unusually dangerous."

We now look at the evidence favorable to the findings by the jury that this was an extra-hazardous crossing, that defendant was negligent in not having a flagman and that this was a proximate cause of the collision. The collision occurred at about 8:50 p. m., well after dark, March 13, 1962. There were no automatic controls at this intersection. The crossing involved is situated in the City of Conroe. The City street, Tenth Street, and the railroad tracks intersect at approximately right angles. Tenth Street runs generally north and south, and the tracks east and west. Plaintiff was driving his bus in a southerly direction, and defendant's train involved in this collision was traveling in a westerly direction. Defendant had two sets of tracks at this intersection, the main line and the passing tracks. The train which collided with plaintiff's bus was traveling on the passing track located about 4 or 5 feet south of the main line. Defendant had a second train which was proceeding in an easterly direction on the main line and was located about three blocks west of this intersection at the time of the collision. Houses located on Tenth Street obscured the view to the east until a point about 67½ feet from the center line of the passing track. The passing track is slightly lower than the main line. The train which struck the bus was moving up a slight incline through a cut, the track being lower than the surrounding right-of-way. The weeds on top of the cut had grown to a height of some 4 or 5 feet. Both trains had their lights on bright. The evidence showed that vehicular traffic is heavy at all times at this crossing. Plaintiff testified he drove up to this crossing and stopped at the crossbuck sign, which is 30½ feet from the center line of the passing track, looked to his left, saw nothing, looked to his right, saw the train approaching from the west and proceeded to cross the tracks. His

bus passed over the main line but was struck at the rear end of the bus by the train approaching from the east. The witness Fenley, in testifying about the view plaintiff had, made this statement:

"Well, the way that embankment is there, he couldn't have seen hardly anything until he got on the track."

This witness testified that the weeds on the embankment obscured a person's view as he approached the track and that the view would be worse at night. The witness, Nell Owens, a passenger on the bus, testified that she did not see the train approaching from the east because it was dark and there was a bunch of weeds growing up there. The witness, Helton, testified he made a traffic count at the crossing during an eight hour period in February, 1963, and that 428 vehicles used the crossing.

The jury could have concluded that under the circumstances existing at the time of this collision that this crossing was extra-hazardous. With trains approaching from opposite directions, the beams of the bright headlights pointed toward one another would likely appear to be only one beam, just as it would not be easy to detect from which side a bell or horn had been sounded. The fact that these two trains were approaching the same intersection at night under the physical layout as it existed, that is, the houses, the cut or channel, the weeds and the inclined track, all were circumstances in evidence which would support the jury finding of "extra-hazardous". As to negligence and proximate cause in connection with the failure to have a flagman, we cannot assume that because plaintiff failed to see the train approaching from the east, he would not have seen a flagman with a flare or lantern standing in the intersection. None of the items set out above supporting the finding that this crossing was extra-hazardous would have prevented plaintiff from seeing a flagman. These findings by the jury were supported by this same evidence.

In passing upon defendant's points that there was insufficient evidence and that the jury's findings as to extra-hazardous and negligence and proximate cause as to failure to have a flagman were against the great weight and preponderance of the evidence, we considered the entire record. No witness personally knew of any previous collision at this crossing even though several City policemen testified in the case. There is a great deal of evidence conflicting with that introduced by plaintiff as to the visibility at this crossing. This evidence did not establish the point as a matter of law, but only served to raise an issue for the jury to determine, which it did favorably to the plaintiff. The fact there was no evidence as to the number of trains operated over this crossing nor their rate of speed does not negative "extra-hazardous" as a matter of law. These are merely items of evidence that have been considered, along with many others, in some of the cases involving extra-hazardous crossings. Such findings of the jury were not so against the weight of the evidence as to be clearly wrong or manifestly unjust. The points are overruled.

The jury found that defendant's train was being operated at a greater rate of speed than it would have been operated by a person of ordinary prudence under the same or similar circumstances, and that this was a proximate cause of the collision. Defendant contends there was no evidence to support these findings, that there was insufficient evidence, and that such findings were contrary to the weight and preponderance of the evidence. First, we consider the favorable evidence on the "no evidence" points. There was no pleading and no evidence as to any statute or ordinance regulating the speed of this train. The tape on the train involved in this collision showed the speed to be 13 miles per hour as this train approached the crossing. The question as to whether a reasonably prudent person would have driven the train at a speed of 13 miles per hour as he approached the intersection with Tenth Street in the City of Conroe, after dark, with the houses situated as they were, with the tracks located as they were, with the incline of the track upon which the train was traveling, with the cut or channel or embankment as they were, with the weeds growing 4 or 5 feet high, and with another train approaching within about three blocks, with the bright lights on both engines and the bells and horns on both engines being sounded, was a question of fact for the jury. Such action was not one of no evidence as a matter of law. Considering the entire record, such findings of negligence and proximate cause were not so contrary to the weight of the evidence as to be clearly wrong or manifestly unjust. The points are overruled.

Defendant further contends there was no evidence to support the findings of the jury favorable to plaintiff on the theory of discovered peril, that such evidence was insufficient to support such findings and that such findings were contrary to the great weight and preponderance of the evidence. The quantum of proof required of the plaintiff on these elements of discovered peril, in order to entitle plaintiff to have the issues submitted to the jury, was whether the facts and circumstances, together with all reasonable inferences therefrom constituted some evidence of probative force of their existence. Much of the evidence has already been discussed. There were several estimates as to the speed the train was traveling. The tape, already mentioned, showed the speed to be 13 miles per hour for a distance of 500 feet as the train approached this crossing. Bertram, the engineer, estimated the speed of the train at such point to be from 6 to 8 miles per hour. The tape was not conclusive proof of such speed and the jury was entitled to accept either version. Bertram also estimated the speed of the bus to be 6 to 8 miles per hour. At 13 miles per hour, the train traveled 19.072 feet per second. At 6 miles per hour, the train or bus would travel 8.8 feet per second. At 8 miles per hour, the bus would travel 12 feet

per second. Bertram testified he first saw the bus when the train was about 130 feet from the crossing, although he had seen the lights on the bus before that time. Bertram also testified he applied the brakes on the train when the train was 40 feet from the crossing, which was the point at which he first realized the bus was not going to stop. The rule is that the jury is not required to accept the testimony of the engineer as to when he discovered the danger and as to the efforts made to avoid the injury. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561. An expert witness called by defendant testified that allowing ¾ second reaction time, this train could be stopped in 165 feet if traveling 13 miles per hour, 95 to 140 feet if traveling 8 miles per hour, and 30 to 55 feet if traveling 6 miles per hour. At 13 miles per hour, 4.7 seconds elapsed while the train was traveling a distance of 90 feet, which is the distance Bertram testified to between the time he said he first saw the bus and the time he applied the brakes. At 6 miles per hour, 10.2 seconds would have elapsed as the train traveled such 90 feet. Bradshaw, the conductor on defendant's train, testified that if the bus had traveled 5 more feet it would have cleared the crossing, and that just a split second was needed for the bus to get out of the way. In much of defendant's argument it is assumed that the only way this collision could have been avoided would be for the train to stop. In the Ford case, supra, it is stated:

"The duty rested upon the train operatives to slacken the speed of the train even if it could not be stopped before reaching the crossing."

The jury could have concluded that the engineer delayed too long in applying the brakes after discovering the perilous position of the plaintiff, and that a prompt application of the brakes would have permitted the bus to pass over the tracks in safety. There was evidence of probative value with reasonable inferences to support the findings of the jury. Considering the entire record, we do not find such finding to be clearly wrong and manifestly unjust. These points are overruled.

■ Defendant next attacks the finding of the jury that plaintiff did not fail to listen for and heed the warning signals of the train as being supported by no evidence and as being against the weight of the evidence. The jury found that as the train traveling west approached the crossing it gave both an audible whistle signal and a bell signal. Plaintiff testified: that as he approached the crossing he heard a train approaching going east; that he stopped the bus approximately where the railroad crossbuck sign is; that he looked to the right and then to the left; that when he looked to the right he saw a train six or seven hundred yards up the track; that this train had a light on and was blowing its whistle; that he heard no other train whistle; that he looked back to the left and saw nothing coming from his left; that he then started across the tracks and something hit the rear end of the bus and turned it over. Plaintiff testified in response to a question on cross-examination that he concentrated his listening facilities to the east (left) and did not hear anything. The jury answer complained of in this point included both "listen for" and "heed". This testimony of plaintiff, together with the other evidence mentioned in connection with other points as to the conditions surrounding this crossing on the night of the collision, support the jury's answer. Considering the entire record, such finding is not so against the weight of the evidence as to be clearly wrong or manifestly unjust. These points are overruled.

■ Defendant maintains that plaintiff was guilty of negligence which proximately caused the collision as a matter of law when he drove his bus onto the crossing. Defendant had plead Sec. 86(c) and (d) and Sec. 88 of Article 6701d, Vernon's Ann.Tex.Civ.St. These articles define a driver's duties when crossing a railroad track as an individual and as a bus driver. Both require the driver to stop and not to

proceed until he can do so safely. The jury found that plaintiff stopped within the statutory distance before going onto the crossing; the train was not plainly visible; that the train approaching from the east was not in hazardous proximity to the railroad crossing before plaintiff's bus reached a point 15 feet from the nearest rail of the railroad track upon which the train was approaching; and that plaintiff did not go onto the crossing when he could not do so safely. The fact that a collision occurred does not convict plaintiff of negligence as a matter of law under these statutes. The Supreme Court has made it clear that the "reasonably prudent person test" is applied to the statutory requirements that a person stop under certain factual situations. See Texas & New Orleans Railroad Co. v. Day, 159 Tex. 101, 316 S.W.2d 402, and Missouri-Kansas-Texas Railroad Co. v. McFerrin, 156 Tex. 69, 291 S.W.2d 931. The same rule of law would apply to a driver "proceeding" after stopping. In this case whether plaintiff proceeded before he could do so in safety was a question of fact for the jury. The point is overruled.

■■■ It is next contended that counsel for plaintiff was permitted to make improper and prejudicial remarks in his argument to the jury. This collision occurred March 13, 1962. Defendant offered in evidence some photographs taken March 29, 1962. These photographs were taken by a professional photographer under the direction of a Mr. Stephens, who was defendant's employee. During the course of the testimony much was said about the condition of the weeds and whether or not the weeds were as high as shown by some photographs offered in evidence by plaintiff, and also whether or not the weeds had been cut or mashed down so as to appear as shown by photographs offered in evidence by defendant. Defendant's photographs were admitted in evidence even though the photographer testified that he had no idea whether the crossing was in the same condition in the pictures as it was on the date of the collision. Mr. Stephens was not called as a witness even though he was present in court at the time of the trial. During the jury argument counsel for plaintiff made the following statement:

"Now, I'm not going to stand up here and tell this jury that Mr. Stephens cut those weeds down or that he had them cut down, but I am going to say this: It was just a short distance from Mr. Stephens' chair to that witness stand, for him to get up there and deny that those weeds were cut down or broken down or not. It was just a short distance, and for some reason unknown to me, known only to the Gulf, Colorado and the Santa Fe Railroad—"

Defendant's objection to this argument was overruled. Later in the argument counsel for plaintiff mentioned the fact that neither Mr. Stephens nor other employees of the defendant came into court to testify about the weeds, and clearly implied that the reason such witnesses were not called is that their testimony would have been detrimental to the defendant. The law is well settled in Texas that counsel is permitted to comment on the failure of his adversary to call a witness and conclude that such failure raises a presumption that the testimony, if produced, would be unfavorable. However, the absent witness must be under the control of or standing in some relation to the opponent and the absent witness must have obtained, or was clearly in a position to obtain, material information on the point at issue. Tex-Jersey Oil Corporation v. Beck, 157 Tex. 541, 305 S.W.2d 162. In the condition of this record, that is, the failure of the defendant to offer proof that the condition of the weeds was the same in the defendant's pictures as on the date of the collision, and the fact that the claim agent of the defendant, Mr. Stephens, was in position to obtain this information, we do not think error was committed. In any event, we do not think such action was reversible error under Rule 434, Texas Rules of Civil Procedure.

■ Also complained of in the jury argument by counsel for plaintiff was the following statement:

"As a result of the hurting in his foot, it aches and pains, just like Dr. Lennon has told you about, and you'll notice that they didn't bring any medical experts in here to controvert anything that Dr. Lennon said about Jack Parmer's condition."

Counsel for defendant objected as follows:

"Mr. O'Brien: May it please the Court, I would most certainly object to that argument because, although Dr. Lennon claimed there was a privilege, there is no way under the law in Texas for us to force Mr. Parmer to submit to any further physical examination."

Another of plaintiff's counsel followed with this remark:

"Mr. Creighton: He could have requested the opportunity to have a physical examination, and its frequently agreed to, and he's never done it and never did even offer to have it done."

The trial court then gave this instruction to the jury:

"The Court: Ladies and Gentlemen, don't consider the remarks made by any of the counsel. Now, let's get moving along."

We construe this instruction of the court to have properly excluded the improper arguments made by counsel for plaintiff. If counsel for defendant was not satisfied with this instruction, further objection and request for further instruction should have been made at that time. We find no error in this point.

■ In its amended motion for new trial defendant assigned as error the fact that the jury was improperly constituted because of the presence of juror Tannery. Mr. Tannery had stated on voir dire examination that even though he knew the plaintiff, he knew of no reason that he could not be a fair and impartial juror. During the course of the trial it developed that plaintiff had a loan from the First National Bank of Conroe upon which he was still making payments. Mr. Tannery was called to testify on motion for new trial and it developed that at the time of this trial he was personnel director of the First National Bank of Conroe and later became manager of the automobile loan department, and also that the bank employees received a Christmas bonus. This situation does not bring Mr. Tannery within the rule disqualifying a juror interested directly or indirectly in the subject matter of the suit. The point is overruled.

■ The issue as to damage suffered by plaintiff listed future medical expenses as one of the items that the jury could consider. There was no evidence as to past medical expense and this item was not included in the damage issue. Defendant contends that the trial court erred in permitting a medical witness called by plaintiff to give his estimate as to the amount of future medical expense. The doctor had first stated that he would have to give an "educated guess" as to the amount of future medical expense. Upon objection, these questions and answers were given:

"Q. (Mr. Creighton, continuing): Doctor, in order to be perfectly fair, would you give me your opinion, based on reasonable medical probability as to the smallest or the minimum amount you would expect that he would incur in the future for medical and drugs?

"A. Counting his drugs, a thousand, perhaps two thousand dollars.

"Q. That would be an estimate throughout his life time?

"A. Yes, sir."

It must be shown by probative testimony that an expense claimed is reasonable and necessary. Dallas Railway & Terminal

Company v. Gossett, 156 Tex. 252, 294 S.W.2d 377. The question asked the doctor satisfied the "necessity" of the future medical expense, but there is no evidence that the estimate given by the doctor was a "reasonable" amount. It was error for the trial court to include future medical expense in the damage issue with no proof that the estimated cost was reasonable in amount. This error may be cured by remittitur. Unless plaintiff (appellee), within two weeks after the filing of this judgment, files a remittitur in the amount of $2,000.00, this case will be reversed and remanded for a new trial. If remittitur is executed and filed with the clerk of this court within said time, the judgment will be affirmed for the balance.