GREAT COASTAL EXPRESS, INCORPORATED ET AL.
v. DARLIN SUE SCHRUEFER ET AL.

[No. 536, September Term, 1976.]

*Decided February 7, 1977.*

The cause was argued before LOWE, MELVIN and LISS, JJ.

*Samuel S. Smalkin,* with whom was *William H. Clark* on the brief, for appellants.

*M. Michael Cramer,* with whom were *Levitan, Ezrin, Cramer, West & Weinstein, Chartered* on the brief, for appellees Shasta Beverages, Inc., and Darlin Sue Schruefer, Administratriz of the Estate of George O. Schruefer, Jr. *John F. Wiley* for other appellees.

LOWE, J., delivered the opinion of the Court.

The widow, children and employer of the driver of a delivery truck which rear-ended a tractor-trailer that had

pulled onto the highway from the driveway of a truck stop moments before the collision, brought suit against the driver of the tractor-trailer and his employer. This is an appeal from the judgment of Judge John J. Mitchell, presiding without a jury in the Circuit Court for Montgomery County, in favor of the plaintiffs. The issue below turned on whether the tractor-trailer had entered the flow of traffic so as to excuse its driver from the rigid responsibility imposed by the "Boulevard Rule". Judge Mitchell decided that it had not.

Appellants, who owned and operated the tractor-trailer, assign 9 errors on appeal. The first 2 appear to be little more than questions of the sufficiency of the evidence:

> "I. The lower Court erred in holding that Appellees were entitled to recover in this case which involved a rear end collision and a violation by the decedent, George O. Schruefer, Jr., of the duty of proper control of his truck.
>
> II. The lower Court erred in entering judgment in favor of the Appellees against Gerald Wayne Smith on his counterclaim against Appellees".[1]

In reviewing such questions, where a court sits without a jury, we are bound by Md. Rule 1086:

> "When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

We have reviewed the evidence submitted by record extract and the comprehensive opinion of the trial judge. We do not

---

1. The record does not disclose that Gerald Wayne Smith appealed. The order of appeal was signed by the attorneys who represented Great Coastal Express, Incorporated and Smith jointly, but those attorneys designated themselves as "Attorneys for the Defendants". Because we affirm on the facts, it is not necessary to determine whether there is an appeal by Smith in his capacity as a counterclaimant.

find him to have been clearly erroneous in his findings of fact and conclusions therefrom; to the contrary, we find his explanation so thorough and so convincing that we adopt that opinion as our own.

Because appellants raised the issue of contributory negligence in their reply brief, we will interject here that our review of the evidence does not disclose evidence of contributory negligence so conclusive that the court should — or could — have found it as a matter of law. It therefore follows that we do not view the factfinder's disbelief of such evidence as was presented, from which an inference of contributory negligence might have been drawn, as clearly erroneous.

We cannot improve upon Judge Mitchell's factual articulation, and therefore we shall set it forth in full before responding to the remaining issues:

*"MEMORANDUM OPINION AND ORDER*

*STATEMENT OF THE CASE*

This case arises out of a motor vehicle collision that occurred on June 13, 1974. The location of the fatal accident was on Maryland State Route 3 in Anne Arundel County near Millersville, Maryland. George Schruefer was operating a truck which collided with the rear end of a tractor-trailer unit owned by the defendant, Great Coastal Express, Inc. and being operated by its employee, Gerald Wayne Smith. Schruefer was killed instantly as a result of the collision. His widow, Darlin Sue Schruefer, and two surviving infant children have brought this action seeking damages. They are joined by Travelers Insurance Company which seeks to recover certain Workmen's Compensation benefits paid to the surviving widow, and Shasta Beverages, owner of the truck operated by the decedent, which looks to the defendant for the property damage and loss occasioned by the collision.

Gerald Wayne Smith has filed a counter-claim seeking to recoup damages for the personal injuries he sustained, the resulting medical expenses, loss of wages, and pain and suffering.

When this case came on for trial, all parties agreed to waive their prayers for a jury trial and a bench trial was conducted.

## QUESTION PRESENTED

The question presents a very narrow issue. The Court must determine whether the plaintiffs are entitled to the protection of the "Boulevard Rule" or whether the defendant and counterclaimant had left the confines of the 'Boulevard Rule' and had joined the 'free flow of traffic.'

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court had the benefit of evidence presented through seventeen (17) witnesses; forty-five (45) exhibits; and two scholarly briefs of the law involved. From all of this, the following facts are found.

George Schruefer and his widow, Darlin Sue Schruefer, were married unto each other in Baltimore, Maryland on February 14, 1968. Two children were born of this union, namely: Barbara Ann, presently six years of age, and Richard Lynn, presently eight years of age. Barbara is a normal, pleasant, little girl. Richard is legally blind and is afflicted with spastic cerebral palsy and suffers a partial paralysis of the lower limbs (See Plaintiff's Exhibit No. 12). The decedent, George Schruefer, entered the employ of Shasta Beverages on April 3, 1973. After one month he became a driver-salesman and at the time of the fateful accident, he was in the course of his employment. On June 13, 1974, at approximately three o'clock in the morning, George Schruefer arose and left his home in Bel Air,

Maryland. He drove to the Shasta plant in Baltimore, Maryland. He then boarded his Shasta truck to make a delivery of soft drinks to Andrews Air Force Base in southern Prince George's County. His two-axle, 1973 Ford truck, unloaded, had a gross weight of fifteen thousand (15,000) pounds. The truck's carrying capacity is seven hundred seventy-one (771) cases and each case weighed twenty-three (23) pounds. The total gross weight of vehicle and load on the morning of the accident was thirty-two thousand seven hundred thirty-three (32,733) pounds. Schruefer had elected to drive in a southerly direction on Maryland State Route 3.

Gerald Wayne Smith was an employee of Great Coastal Express, Inc. On June 12, 1974, he had driven a tractor-trailer unit from Richmond, Virginia to the metropolitan New York City-New York area and made certain deliveries. He took on other materials to be delivered in Richmond, Virginia and after an appropriate rest resumed his journey eventually entering Maryland State Route 3. At or near Millersville, Anne Arundel County, Maryland, there is situated, on the west [sic] side of southbound Route 3, a transit truck stop. Mr. Smith stopped at this location some time about four o'clock in the morning and had some coffee. He then checked his tractor and trailer and was satisfied that all running lights were in operation. He was operating a 1972 White Freight Line. The total overall length of his tractor and trailer was fifty-five (55) feet. The gross weight of the tractor, the trailer, and the cargo was sixty-four thousand eight hundred (64,800) pounds. The tractor had ten (10) forward speeds. Mr. Smith chose to return to the southbound lanes of Route 3 by using the southern most exit from the truck stop. At this point Route 3 is a double laned, paved highway. The posted speed limit was fifty-five (55) miles per hour. To enter this boulevard from the truck stop, a

vehicle must cross a fourteen (14) foot shoulder to reach the paved road and then must turn left to enter the flow of traffic. There are no overhead lights on the roadway at this point. One June 13, 1974, the air was clear and relatively balmy and the roads were dry. Prior to entering this boulevard, a driver, looking to his right from the point entered by Smith, can see to a crest of a hill. According to the investigating police officer, that crest is "four to five tenths of a mile." A southbound vehicle approaching that crest finds that the roadway curves to the right. Smith entered the roadway and told the police that he had gone one-half (1/2) of a mile when two tractor-trailer units passed him on his left and he was then struck in the rear end by the Shasta truck.

Police Officer Robert Short of the Anne Arundel County Police Department arrived on the scene and conducted an investigation. He concluded from the location of the vehicles involved in the accident that the point of impact was two hundred fifty-two (252) feet from the southernmost point of the driveway used by Smith. The Court finds this to be conclusive. Substantial damage was suffered by each vehicle and Schruefer was killed instantly. There were no skid marks on the road that would reflect that the brakes on the Schruefer vehicle had ever locked prior to impact. Smith said that from his vantage point in the driveway, that he could see a distance of one and one-half (1 1/2) miles. The Court finds that Smith could not observe this distance because of the terrain and the curve in the road. Smith also testified that he was shifting into sixth gear and had attained a speed of approximately thirty-five to forty (35-40) miles per hour. There was further received a tape from a tachometer. The tape would seemingly reflect that Smith's vehicle had attained this speed at the time of impact.

The Court had the benefit of one Roy Smith who is a trucker and repairman of tractors and rigs. He had conducted a series of tests with a tractor and loaded rig comparable in horsepower, size, and weight to that of the Great Coastal Express vehicle being operated on the morning of the accident. He testified that the maximum speed that could be attained was fifteen (15) miles per hour. He had conducted the test a dozen times. His testimony was far more persuasive than that of the defendants and the tape from the tachometer. More will be said of this tape at a later point. The Court finds that the defendant's rig was proceeding, at the time of the collision, at a speed of approximately fifteen (15) miles per hour.

There was evidence presented by the defense through Mr. James Frankenfeld. He was driving a tractor and flatbed on the morning of the accident and observed the Shasta truck entering Route 3. He pulled to his left to permit the truck a clear entry. He was driving his rig at a speed of fifty-five (55) miles per hour. He observed the Shasta truck approaching him from the rear and it appeared to be over the center line. He (Frankenfeld) reduced his speed to forty (40) miles per hour and moved to the right and the Shasta truck passed him at a speed of fifty-five (55) to sixty (60) miles an hour. The driver of the Shasta vehicle appeared to be slumped over. Moments later, Frankenfeld came upon the accident scene; stopped and rendered aid.

The Court finds as a fact that the Shasta truck was, at that point in time, proceeding at a speed of at least fifty-five (55) miles per hour. The proffer as to the operator being slumped over is mystifying. There was no evidence that Schruefer had consumed any alcoholic beverage prior to the accident. In fact, his wife said he had not had any and the Medical Examiner found no evidence of alcohol in Schruefer's system (See Plaintiff's

Exhibit No. 1). It is a further fact that Dr. Irwin M. Sopher found that Schruefer's cause of death to have been head and brain injuries. There is no suggestion that death resulted from any cardiac problem that arose prior to the collision. Therefore, the Court gives no particular significance to the testimony that Schruefer was slumped over. Such evidence simply had no probative value.

Reduced to its simplest form, had the defendant's vehicle entered the flow of traffic?

The tachograph tape (Defendant's Exhibit No. 16; a tachograph (Defendant's Exhibit No. 17); and an instrument used to seal the tachograph and identified as Defendant's Exhibit No. 18, were received into evidence over the objection of the plaintiffs. The tachograph is a mechanical instrument which is attached by wiring to the transmission of the tractor. It is a timing and measuring device which, when in operation will record, on a tape, the stops, starts, distances travelled, and speed of the tractor. Defendants offered evidence through Robert M. Williams, its traffic manager, that a new tape is inserted in the tachograph when one of Coastal's trucks goes on a run. The unit is sealed and the tape is removed when the vehicle returns. The manager then reviews the tape to check on speeds, stops, and the like. As such, the Court concluded that the tape might be regarded as a record kept in the normal course of business (See Snyder v. Stouffer, 270 Md. 647 (1974)). As stated at trial, the tape would receive such weight as the Court would choose to give it.

The Court has been unable to locate an appellate decision in this jurisdiction dealing with the tachograph. There have been rulings concerning this device in other jurisdictions, to-wit: *Villegas, et al.* v. *Bryson, et al.*, 494 P. 2d 61 (1972); *Bell, et al.* v. *Kroger Co., et al.*, 323 S.W.2d 424 (1959); *Hall* v.

*Dexter Gas Company, Inc.*, 170 So. 2d 796 (1964); *Thompson* v. *Chicago and Eastern Illinois Railroad Co.*, 148 N.E.2d 151 (1961); *Johnson* v. *New York Central Railroad Co.*, 97 N.W.2d 769 (1959); *Cooper* v. *Hoeglund*, 22 N.W.2d 450 (1946); *Gulf Colorado and Santa Fe Railroad Co.* v. *Parmer*, 389 S.W.2d 558 (1965); *Texas and N. O. Railroad Co.* v. *Lemke*, 365 S.W.2d 148 (1963); *Union Transports, Inc.* v. *Braun*, 318 S. W. 927 (1958); *Biggers* v. *Continental Bus Systems, Inc.*, 303 S.W.2d 359 (1957); and *Whitten* v. *Central of Georgia Ry. Co.*, 79 S.E.2d 331 (1953).

There is also a delightfully informative article on the tachograph at 8 Wayne Law Review, 287 (1962) entitled, *The Tachograph As Evidence of Speed.* The defendants urge that this tachograph tape corroborates their theory that their vehicle had attained a speed of thirty-eight (38) miles per hour and thus, had joined the flow of traffic as defined in *Kowalewski* v. *Carter*, 11 Md. App. 182 (1971); *Grue* v. *Collins*, 237 Md. 150 (1964); *Quinn Freight Lines* v. *Woods*, 266 Md. 381 (1971). This being so, the defendants conclude that the plaintiffs lose benefit of the "Boulevard Law" and consequently must fail in their claim for damages because of the decedent's contributory negligence. This presumes, of course, that the recordings made by the tachograph were accurate. Maryland has long recognized that the speed of motor vehicles may be measured by radar (CJ § 10-301). The United States District Court for the District of Maryland in an Opinion by then Chief Judge Thomsen upheld the use of radar in *George Dreos* v. *United States*, 157 F. Supp. 200 (1957). In addressing the burden of proof on the government, the Court said:

> 'It is sufficient to show that the equipment has been properly tested and checked, that it was manned by a competent operator, that proper operative procedures were

followed, and that proper records were kept.' at page 208

In *Villegas* v. *Bryson,* supra, the Court of Appeals of Arizona concluded that a tachographic tape is competent evidence of speed if the tape is properly identified and authenticated. However, that Court concluded at page 62 that:

'(t)he tachograph recording must be identified and duly authenticated which should include proof that the particular instrument relied upon was in good working order and accurate at the time the recording was made.' (Emphasis Supplied)

Plaintiffs produced evidence through the deposition of Robert M. Williams, manager for the defendant corporation, that at the time of the collision, the defendant's tractor had attained an odometer reading of two hundred sixty-five thousand (265,000) miles. Some adjustment had been made to the tachograph at one hundred eighty-six thousand, three hundred twenty-six (186,326) miles. The tachograph was never, to the knowledge of the witness, calibrated either before or after the collision. In short, this Court concludes that the tape is not worthy of belief because it fails to meet the standards recited in *Dreos* and *Villegas,* supra.

Of more persuasion is the evidence of the trucker and repairman, Roy Smith. Over the objections of the defense, the witness was permitted to testify as to the results of certain experiments he had conducted on the site of this accident. Our Court of Appeals has said that if an experiment is conducted outside the courtroom, it must be done under circumstances and conditions similar to those of the case at hand if the experiment is to be received in evidence (*Smith* v. *State Road Commission,* 240 Md. 525, 537 (1965) and cases cited therein). The

experiment conducted by Smith was with a tractor of a similar type as the Great Coastal tractor; a rig and load of similar weight; and operating from the same driveway exit used by Great Coastal on the morning of the accident. The unit was driven into the same lane as that used by Great Coastal and the only material difference was that Route 3 had a new coating of blacktop applied since the accident. The experiments were conducted for the sole purpose of showing the maximum speed and gear that could be accomplished by this unit within a distance of three hundred and seven (307) feet from the point where the Great Coastal Express rig entered Route 3.

The Court is satisfied that the Great Coastal Express rig could have attained fourth (4th) gear and a maximum speed of fifteen (15) miles per hour at the point of impact. The Court is persuaded of this fact because the experiment was conducted several times. The witness, Roy Smith, displayed a good demeanor. He gave good, conclusive reasons for his findings and the Court makes this finding as a matter of fact.

There was no explanation given in evidence to enlighten the Court as to why the deceased driver's vehicle did not reflect any locking of brakes and wheels that would result in skidmarks on the roadway. Absent evidence the reasons would be idle speculation. This lack of evidence alone will not be of sufficient quality to find the deceased to have been contributorily negligent. The presumption of the natural instinct to guard against danger is proper to consider in this area (See *Baltimore Transit Company* v. *Castandra*, 194 Md. 421, 434 (1950)).

This then brings us to the determination of liability. I am not convinced that the defendant's rig had, in fact, entered the flow of traffic so as to escape the restrictions of the 'Boulevard Rule.'

While the defendant's rig was, in fact, fifty-five (55) feet in overall length, one must surmise that the front end of the Coastal tractor had attained only five and one half (5 1/2) vehicle lengths on a road designated to expedite the flow of traffic at speeds of fifty-five (55) miles per hour. The speed of the vehicle of Shasta Beverage simply is not considered. The proximate cause of the accident was the negligence of the defendants in impeding the traffic on the boulevard [*Hensel* v. *Beckward*, 273 Md. 426 (1974), *Creaser* v. *Owens*, 267 Md. 238 (1972)]. Even as the Court of Appeals referred to the 'Rock of Gibraltar' in *Hensel*, supra, this Court finds that the mandates of the 'Boulevard Rule' must stand; and absent a legislative directive, it shall not be compelled to take into consideration the calculations of speed and distances. A judgment shall be entered in favor of the plaintiffs and the defendant Smith's counter-claim shall be dismissed.

## DAMAGES

Many of the damages claimed, such as the subrogation claim of the Travelers Insurance Company and Shasta Beverage are liquidated and have been stipulated. The more troublesome area lies in a fair and reasonable determination of what the defendants must pay for the 'Piece of the Rock' that they have purchased.

The deceased was married to the plaintiff-widow, the father of two children, and the total source of income for the family. Evidence showed him to have been a normal, healthy male with a life expectancy, at the time of his death, of forty-six (46) more years. Evidence adduced from Dr. Herman P. Miller, an economist and statistician, showed that Mr. Schruefer would have had a work-life expectancy of thirty-seven (37) years. His

income for the several months prior to his death was Seven Thousand Thirty-six Dollars ($7,036.00) and for that taxable year was projected to Fifteen Thousand Five Hundred Dollars ($15,500.00). Evidence of fringe benefits received and that would be received was received by the Court. There is then to be considered the loss of society and companionship suffered by the plaintiff, Darlin Sue Schruefer, as a result of the untimely death of her husband, George Schruefer.

The plaintiff was described as a family man. He had served with the Bel Air Rescue Squad and was recognized in the year preceding his demise as their man of the year. Closer to the family, he labored with his son seeking to strengthen that child's afflicted body through therapy and exercise. Uncontradicted evidence showed that he devoted up to two hours per day in this endeavor. He played with his children; aided them in their homework; did simple chores and repairs about the marital home and otherwise led a wholesome, if modest, lifestyle.

Testimony showed Mr. Schruefer's needs in material matters to be few and extravagancies to be non-existent. An occasional movie or a meal out would apparently constitute the extravagance. The deceased was a basic family man, a good husband and a loving and doting father. What award of damages can attempt to replace the life of this man in the lives of his widow and children? After extensive direct testimony and cross-examination, Dr. Miller gave evidence that an award of Three Hundred and Three Thousand, Seven Hundred Eighty-eight Dollars ($303,788.00) would fairly compensate the plaintiff, Darlin Sue Schruefer, for the income that she would lose as a result of George Schruefer's demise. This does not take into account the loss of companionship, love, affection, and other

intangibles that are to be identified as the assets of a good marriage. Again, the Court must attempt to fairly compensate the widow for this loss. The award must not be punitive since it is not a reward.

The problems occasioned by the infant plaintiffs through the death of their father, George Schruefer, are similarly complex and overreaching. His son would, undoubtedly, have been totally dependent on Mr. Schruefer for many, many years. The two hour therapy and play sessions are now gone. The widow-mother strives to give the son therapy. The results remain to be seen. Again, the value of Mr. Schruefer's love, work, and companionship to this youngster is an intangible. The Court will strive to fairly compensate this loss.

The decedent's infant daughter has also suffered a great loss through his death. There was evidence that this young girl was treated as a young female would enjoy being treated by her father. He loved her and had her education and training to look forward to. Redundant as it reads, this is now gone. A fair award in this regard must be made.

In making an award of damages to the infant surviving children of the deceased, one must be mindful that their cause of action arose on June 13, 1974. At that time they did not, by statute, have the benefit of a claim of companionship, comfort and the like suffered as a result of the death of a parent as contemplated in CJ § 3-904 (d), Annotated Code of Maryland. This legislative oversight was remedied by the legislature in 1975 when the aforementioned statute was amended to include '(o)r parent of a minor child.' This became effective on July 1, 1975, and was prospective only. Therefore, the Court must apply the test set forth in *State of Maryland* v. *Thomas*, 173 F. Supp. 568 (1959), and followed in *Cincotta* v. *United States*, 362 F. Supp. 386 (1973).

The defendants urge that if an award is to be made in favor of the plaintiffs that the Court must consider a net income basis for recovery since any judgment is not subject to federal or state income taxes. In support of this proposition, the defendants rely on the appellate decision of the State of New Jersey, citing *Tenose* v. *Nu Car Carriers, Inc.*, 341 A. 2d 613 (1975). The opinion is interesting but reflects a minority recognized in New Jersey, Rhode Island, and Connecticut. This problem has been fairly addressed by the Maryland Court of Appeals and is not, at this time, the accepted law of this State [See *Hutzell* v. *Boyer*, 252 Md. 227 (1969), and *Sun Cab Company* v. *Walston*, 15 Md. App. 113 (1972)]. For these reasons, the Court concludes that in determining damages the question of federal and state income taxes shall not be considered.

## ORDER

For the foregoing findings of fact and conclusions of law, it is, by the Circuit Court for Montgomery County, Maryland, on this 26th day of March, 1976,

ORDERED, that the Clerk of the Circuit Court for Montgomery County, Maryland, shall make the following docket entries in this case:

1. Judgment for the Plaintiff, Shasta Beverages, against the Defendant, Great Coastal Express, Inc., in the sum of Eighteen Thousand One Hundred Dollars and Two Cents (18,100.02) plus costs.

2. Judgment in favor of Plaintiff, Traveler's Insurance Company, against the Defendant, Great Coastal Express, Inc., in the sum of Fifty-four Thousand Five Hundred Dollars ($54,500.00) plus costs

3. Judgment in favor of Plaintiff, Darlin Sue Schruefer, against the Defendant, Great Coastal Express, Inc., in the sum of Three Hundred and Fifty Thousand Dollars ($350,000.00) plus costs.

4. Judgment in favor of Plaintiff, Richard Lynn Schruefer, an infant, against the Defendant, Great Coastal Express, Inc., in the sum of One Hundred Thousand Dollars ($100,000.00) plus costs.

5. Judgment in favor of Plaintiff, Barbara Ann Schruefer, an infant, against the Defendant, Great Coastal Express, Inc., in the sum of One Hundred Thousand Dollars ($100,000.00) plus costs.

6. Judgment in favor of the Counter-Defendants, Schruefers, et al., against the Counter-Plaintiffs, Gerald Wayne Smith, with costs.

> s/ John J. Mitchell
> JOHN J. MITCHELL
> JUDGE of the Circuit Court for
> Montgomery County, Maryland"

Appellants' arguments, relying on *Grue v. Collins*, 237 Md. 150 and *Ness v. Males*, 201 Md. 235, that the Boulevard Rule has no application to this case, is in error. In both cases the Court of Appeals stated that it was the function of the factfinder to determine from the evidence whether the unfavored driver had sufficiently entered the flow of traffic so as not to interfere with the rights of the favored driver. Judge Mitchell — as the factfinder — addressed that issue and arrived at his conclusion from his view of the evidence.

### III.

"The lower Court erred in holding that Ronald Smith was qualified to testify as an expert as to the maximum speed capacity of the Coastal Express tractor-trailer driven by Appellant, Gerald Wayne Smith".

One of the Court of Appeals' most recent utterances reaffirmed the holding in *Casualty Ins. Co. v. Messenger*, 181 Md. 295, 298-299 that a witness may be competent to express an expert opinion if he is *reasonably* familiar with the subject under investigation, regardless of whether this special knowledge is based upon professional training,

observation, actual experience or any combination of these factors. *Radman v. Harold*, 279 Md. 167 (1977). It is apparent from the opinion of Judge Mitchell that, as judge, he found the witness adequately qualified, and as factfinder, he found the witness most persuasive. We see no error in either instance.

## IV.

"The lower Court erred in holding that the said witness, Ronald Smith could testify to the results of an experiment allegedly made with another truck".

Our review of the record indicates that appellants did not preserve this question by proper objection at the time. Appellees had just concluded a hypothetical question regarding the speed that was attainable by appellants' vehicle under the circumstances described. To bolster the expert opinion, appellees sought to elicit that the expert had conducted an experiment simulating the conditions that appellants had described. Where it was necessary to vary the circumstances, appellees overcompensated on the side of prudence, so that the variable factors would necessarily militate in favor of appellants.

In order to bring forth the circumstances of the expert's experiment, appellees propounded questions of a leading nature. The only objection that appellants offered to any of the testimony relating to the experiment was to the nature of the questions and the absence of the time of the experiment, which the court directed should thereafter be established.[2]

"MR. SMALKIN: If the Court please, I object to the line of questioning. Every question is leading. I object now. He is his expert. We don't have a date when it was made or any written report from the expert.

THE COURT: All right, set the time."

_____

2. Appellees proffered that the necessity of utilizing *overcompensated* equipment was due to appellants' refusal to permit the use of its own equipment.

Although grounds for an objection need not be stated unless requested, Md. Rule 522 d., we have held that, if counsel volunteers his grounds at the time of the objection, he is bound on appeal to the grounds expressed. *von Lusch v. State*, 31 Md. App. 271, 286-287, reversed on other grounds 279 Md. 255, 368 A. 2d 468 (1977). The procedures involved in the test and the results were thereafter brought before the court by continued question and answer, without objection.

Appellants now attempt to attack the experiment testimony because the experiment was not identical to the conditions at the accident. We do not believe that appellants have preserved that issue within the meaning of Md. Rule 522 d. 1. as interpreted by *von Lusch, supra.*

But had appellants preserved the issue, it would have availed them naught. We are aware that:

> "For evidence of experiments performed out of court to be admissible they must have been made under similar conditions and like circumstances to those existing in the case at issue." *Smith v. State Roads Comm.*, 240 Md. 525, 537.

However, the Court of Appeals has made it clear that:

> "Trial judges are vested with a generous amount of discretion in this area and this discretion will not be disturbed on appeal unless abuse is apparent." *Id.* at 538.

In view of the overcompensation of all dissimilar factors to favor appellants, we can see no abuse of discretion. The opinion of an expert witness, the grounds on which it was formed and the weight to be accorded it are for the trier of facts. See *Duvall v. Potomac Electric*, 234 Md. 42, 47; *Bergeman v. State Roads Comm.*, 218 Md. 137, 142-143.

## V.

> "The lower Court erred in the interpretations and effect given to the tachometer admitted in evidence on behalf of the Appellants".

As noted in the opinion, the trial judge admitted the tachometer in appellants' truck into evidence. However, in assessing the weight to be given it, he pointed out that it had not been adjusted for at least 75,000 miles before the collision and had never, before or after the collision, been calibrated. For that reason he found the device so unpersuasive as to be unworthy of consideration.

Appellants argue that the court erred in giving the evidence no weight, contending that it was entitled to at least some weight. That, of course, is not the law. The trier of fact may believe or disbelieve, accredit or disregard, any evidence introduced. See, *e.g.*, *Phelps v. Goldberg*, 270 Md. 694, 705; *Gray v. Dep't of Correction*, 230 Md. 508, 511-512. We may not — and obviously could not — decide upon an appeal how much weight must be given, as a minimum to each item of evidence. A machine is no more entitled to be credited than is a witness. Belief of either is a subject for the factfinder, not by an appellate court. The judge admitted it, considered it and rejected it, as he was entitled to do.

## VI.

"The lower Court erred in allowing counsel for the Appellees to question Robert Milton Williams, operations manager of Great Coastal Express Co., Inc., as to the report made by him to the interstate commerce commission".

When appellants cross-examined the manager of Coastal Express Lines, Incorporated, he was asked whether he had asked the driver what time the accident had occurred. The following controversy ensued:

"BY MR. CRAMER:

Q Did you ask him what time the accident happened?

A I can't specifically say. I'm sure I did.

Q Did he say it happened at five a. m.?

A I can only answer that —

Q Just a yes or no. Did he say it happened at five a. m.?

A I don't remember.

Q Would you look at your records?

MR. SMALKIN: Objection.

MR. CRAMER: I am just asking, Your Honor — the full purpose of this is to ask the witness whether or not he made a report of the main things.

MR. SMALKIN: That's different. The question, I don't object to. If you are going to ask him to refer to a paper, the law says it's not admissible. I object, therefore, in reference to that particular paper.

MR. CRAMER: Just for the purpose of refreshing his recollection, Your Honor, that was all. It's not going into evidence. The damaging material is not going in.

THE COURT: Is your memory refreshed?

THE WITNESS: Your Honor, I can't remember what I asked Gerald Smith specifically —

THE COURT: All right.

THE WITNESS: — at the time of the accident or what his answer was.

THE COURT: Okay.

BY MR. CRAMER:

Q Mr. Williams, if he would have said other than five o'clock you would have put something down other than five o'clock, wouldn't you?

A I would think so.

Q Will you please tell us what you put down as the time of the accident?

MR. SMALKIN: Objection, if he has to refer to the paper.

MR. CRAMER: He can just use it to refresh his recollection. It's not damaging. I am not going to submit the report as evidence.

THE COURT: I will permit it.

BY MR. CRAMER:

Q What time did you report after your conversation with him as to the accident?

A It says on this paper, time of accident, five o'clock."

Appellants contend that the Interstate Commerce Act proscribes the admission or use of Interstate Commerce reports, citing *Blankenship v. General Motors Corporation,* 428 F. 2d 1006. The pertinent statutory section reads:

> "*Accident reports.* No report by any motor carrier of any accident arising in the course of the operations of such carrier, made pursuant to any requirement of the Commission, and no report by the Commission of any investigation of any such accident, shall be admitted as evidence, or used for any other purpose, in any suit or action for damages growing out of any matter mentioned in such report or investigation." 49 USCA § 320 (f).

We need not decide whether the limited use at issue here is a violation of the statute. For us to reverse, even if the use of the report to refresh recollection was proscribed, we would also have to find that its use was prejudicial as well. See *Blondes v. Hayes,* 29 Md. App. 663. We can see no indication of prejudice. If appellants violated federal law, they must answer for their conduct before that bar of justice.

"VII. The lower Court erred in its determination of damages in this case.

VIII. The lower Court erred in admitting the testimony of the witness, Herman Miller, as to losses or damages sustained as a result of the death of George O. Schruefer, Jr.

IX. The lower Court erred in admitting the testimony of the witness, Herman Miller, as to the prospective increase in the cost of living in estimating damages".

Appellants discussed these three issues together, and we will respond in the same manner.

The short answer to appellants' broadside allegation of error in determination of damages is that we can no more speculate upon what amounts were attributed to what factors by the judge, than he could if the case had been tried by a jury.

Next, we find no error in admitting expert testimony regarding damages. It was said in *Casualty Ins. Co. v. Messenger, supra,* discussing the qualifications of an expert witness:

> "... that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury [or factfinder] assistance in solving a problem for which their equipment of average knowledge is inadequate." 181 Md. at 298.

If expert opinion is reasonably calculated to assist the factfinder, not to confuse him, it is admissible in the sound discretion of the court. *Williams v. Dawidowicz,* 209 Md. 77, 86-87. By the very fact that the judge, who was also factfinder, admitted and considered the economist's testimony as to such factors as the work life expectancy of the decedent and reduction of future earnings to present worth, indicates that he did not feel sufficiently apprised of economic factors to make that judgment without the aid of someone specially trained and skilled in the economic world. See *Langenfelder v. Thompson,* 179 Md. 502. The court did not abuse its discretion in hearing the expert.

Although appellants' assignment of error in question IX is directed expressly to the expert's testimony of "the prospective increase in the cost of living in estimating damages", their argument wanders afield, critically analyzing the entire testimony. We will not respond to the broader observations in the argument except to say, as we have already, such testimony is a proper field for expertise especially in the complexities of today's economy.

The issue they expressly raised in their question is also

easily answered. In the first instance, we find no testimony by Herman Miller in regard to a projected increased cost of living. The only testimony remotely relating to that was about a prospective wage rate or productivity increases:

"Q Now, what other factors did you take into consideration in attempting to establish his perspective earning loss?

A Now, in talking about the future or at least the present value of the future earnings, there are two separate factors that we have to consider. First of all, in my judgment, we cannot assume that his earnings throughout the rest of his life will be exactly what they are or what they would have been today. We know that workers have received increases. We know that there are productivity increases in the economy. We know there are historic wage rate increases in the economy and we have every reason to suspect these to continue in the future.

Q Excuse me, Mr. Miller. In your field of endeavor as you have described, is it an accepted practice to take into consideration this factor?

A Yes, it's very much so. For example, the government, in making its own projections of real output of the economy, when the government wants to know what will be the total value of goods and services, say twenty years from now, they will invariably allow for growth and productivity and almost always will use the factor of three per cent which we would regard as a minimum. Because over the past fifty or more years, the average worker, working at the average job, and a man turning out shoes in a shoe factory, a man turning out an automobile, the cost increases of technology because of employment in health and training, this productivity is going to go up and historically it's going up at the rate of three per cent a year. And this is something I think we can count on. We have

to count on this in society. If our productivity starts going down — That I would regard as a minimum.

I might say in addition, we know that prices have gone up as far back as we can measure. We have every reason to believe that prices will continue to go up. That would have to be added on to the three per cent. In all of the calculations I have done for this project, I did not use any growth rate of more than three per cent but I did use a growth rate of three per cent."

Appellants offered no objection to this testimony and it is, therefore, not subject to our review. Md. Rules 522 d. 1., 1085. The question posed next was objected to, but it related only to the witness' opinion of whether the percentage he had adopted from the government's projections was a conservative figure:

"Q Can you tell us whether or not three per cent could be conservative?

A Yes, extremely conservative.

MR. SMALKIN: Objection. If the Court please, we are getting into the field of speculation, I believe, which is to be the future trends."

The court sustained the objection, and appellants received all of the relief to which they were entitled or for which they had asked. The issue of prospective cost of living increases was not clearly raised below and certainly was not preserved for our review by an objection.

\* \* \*

Appellants raised a new issue by way of reply brief to which appellees were unable to respond. Notwithstanding the procedural impropriety, the issue appears to have merit.

Travelers Indemnity Company, the decedent's employer's insurer, was allowed to intervene as a party plaintiff

because it had paid workmen's compensation benefits to the decedent's dependents pursuant to a Workmen's Compensation Commission award. Md. Code, Art. 101, § 58 provides that the insurer is entitled to be reimbursed, if the dependents prevail against the tort-feasor, for the compensation paid, including amounts paid for medical, surgical and funeral expenses and any other purpose enumerated in § 36 of that article. However, as Travelers recognized in its motion to intervene, the trial judge recognized in his opinion, and, in construing § 58, numerous cases have recognized, the insurer's right is one of subrogation. See, e.g., Gray v. State Roads Comm'n, 253 Md. 421, 424-425; Brocker Mfg. v. Mashburn, 17 Md. App. 327, 340. Accordingly, the trial judge erred in entering a separate judgment for Travelers.

Although we are empowered by Md. Rules 1070 and 1075 b. to alter or modify the judgment as to Travelers, we are unable to exercise this power in this instance. We cannot tell if the trial court reduced the amount it would have awarded the widow and children by the amount it awarded Travelers, or if the award of the latter amount was in addition to what the widow and children would have received had the insurer not intervened. Inasmuch as this case was tried to the judge and not a jury, modification of the award on remand should pose no particular difficulty.

A further reason why we are unable to modify the judgment is our confusion from the record over the proper amount due Travelers. It was awarded $54,500.00, the amount given in an interrogatory by the decedent's employer as the total amount expended on workmen's compensation. But the record also contains a letter from Travelers to the effect that it paid Darlin Sue Schruefer a total of $8,831.70 for funeral expenses and compensation. Whether the difference between the two sums reflects amounts paid to the deceased's children, amounts paid for purposes specified in § 36 of Art. 101, or amounts paid for other purposes, we are unable to say. On remand the trial court should articulate the basis of the award in favor of

Travelers. If necessary for clarification, the court may hear from counsel or witnesses on that limited issue. See Md. Rule 1071.

> *Judgment in favor of Shasta Beverages affirmed; judgments in favor of Darlin Sue Schruefer, Richard Lynn Schruefer, Barbara Ann Schruefer and Travelers Indemnity Company vacated and remanded for modification and entry of proper judgments in accordance with this opinion.*
>
> *Costs to be paid by the appellants.*