717 A.2d 964

**F. Keen BLAKER**

v.

**STATE BOARD OF CHIROPRACTIC EXAMINERS.**

**No. 1259, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Sept. 30, 1998.

246

Paul J. Weber (Hyatt, Peters & Weber, P.A., on the brief), Annapolis, for appellant.

Cynthia G. Peltzman, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General and Roberta L. Gill, Asst. Atty. General on the brief), Baltimore, for appellee.

Before SALMON and BYRNES, JJ., and JAMES S. GETTY, Judge (retired), Specially Assigned.

BYRNES, Judge.

F. Keen Blaker, D.C. appeals a judgment of the Circuit Court for Baltimore County affirming the finding by the Board of Chiropractic Examiners ("Board") that he violated the Maryland Chiropractic Act, Md.Code (1994 Repl.Vol.), § 3–313(9) of the Health Occupations Article ("H.O."), by rendering "professionally incompetent" treatment to a particular patient.[1] Dr. Blaker presents the following questions for review, which we have renumbered and slightly rephrased:

I. Were Dr. Blaker's due process rights violated because H.O. § 3–313(9) is void for vagueness?

II. Was the Board's finding of incompetence supported by substantial evidence?

III. Did the contact between Mr. Paul Goszkowski, D.C. and Ms. Roberta Gill, Esquire, and the Board constitute an *ex parte* communication, in violation of Md. Code, (1995 Repl.Vol.), State Government Article, § 10–219, which violated Dr. Blaker's due process rights?

IV. Did the Board improperly consider evidence not relevant to the charged offenses and improperly sanction Dr. Blaker for uncharged offenses, thus denying Dr. Blaker due process of law?

V. Did the Board exceed its authority by imposing conditions on Dr. Blaker's probation?

VI. Did the Board improperly refuse to allow Dr. Blaker discovery of documents pertaining to actions taken by the Board in response to allegations of incompetence in other cases?

We answer "yes" to question II and "no" to the remaining questions. Accordingly, we affirm the judgment of the circuit court.

---

1. H.O. § 3–313 was amended in 1996 and 1997. The current version of H.O. § 3–313 appears in the 1997 Cumulative Supplement to the Health Occupations Article.

## FACTS

Dr. F. Keen Blaker has been licensed to practice chiropractic in Maryland since 1968. In his practice, he employs a chiropractic technique known as Directional Non–Force Technique ("DNFT"). DNFT involves analyzing the patient's foot reflexes to determine whether there is nerve pressure and, if pressure is found, performing a DNFT "correction" or "adjustment" by manipulating the patient's body.

In April 1994, Patient "A" filed a complaint against Dr. Blaker with the Board. The Board investigated the complaint and on May 24, 1994, charged Dr. Blaker with "professional incompetence" under H.O. § 3–313(9), which provided:

Subject to the hearing provisions of § 3–315 of this subtitle, the Board may deny a license to any applicant, reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the applicant or licensee:

. . .

(9) Is professionally, physically, or mentally incompetent[.]

On August 10 and September 14, 1995, the Board held an evidentiary hearing on the charges against Dr. Blaker. Patient A testified that Dr. Blaker had treated him on five occasions. His first visit to Dr. Blaker took place in May 1989. Patient A had just tested positive for HIV (Human Immunodeficiency Virus) and sought treatment to ensure that his "body was in line and everything was where it was supposed to be and functioning properly in order to give [his] system an opportunity to better battle [the] virus and live a longer and healthier life." Patient A testified that during the office visit, he filled out a health inventory form. Dr. Blaker did not review the information in it with him. Dr. Blaker performed a chiropractic adjustment to Patient A that day. He did not make a record of it, however. Dr. Blaker's notes for that visit state only "lymphy" and "HIV positive."

Patient A returned to Dr. Blaker twice in June 1990, both times complaining that his feet were turning outward. Dr. Blaker did not inquire about Patient A's health status or about

treatments he had received in the interim from other health care professionals. He also did not update Patient A's health inventory. Although Dr. Blaker performed adjustments to Patient A during both visits, he made no record of them.

On January 28, 1994, Patient A returned to Dr. Blaker with complaints of excruciating pain and tightness in his lower back. He told Dr. Blaker that the pain was so intense that he could not lower his left leg. During the office visit, Patient A was in so much pain that he had to grab onto the reception counter to support himself. He had been unable to drive to Dr. Blaker's office because he could not use his foot to operate the clutch on his car.

As they were standing in the office waiting room, Dr. Blaker advised Patient A that he had slipped a disc, and had probably done so shoveling snow. Patient A denied that he had been shoveling snow; he attributed the likely cause of the pain to weight lifting. According to Patient A, Dr. Blaker then told him that his stance indicated that he had slipped a disc.

Patient A testified that he was taken into an examining room and that while he was fully clothed in winter garb, including heavy work boots, Dr. Blaker pulled on his feet and manipulated his back. Dr. Blaker did not ask Patient A about his health status, did not perform any diagnostic tests, and did not make a record of his findings, treatment, or prognosis. He told Patient A to treat his back with ice for 72 hours but did not give him any written instructions about how to do so.

Instead of applying ice to his back for twenty minute intervals, as he was supposed to do, Patient A mistakenly kept ice on his back for 72 straight hours, removing it only when he needed to use the bathroom. Thereafter, on February 1, 1994, he returned to work. He left work after only a few hours, however, when the numbness from the ice wore off and his pain returned.

Patient A went back to Dr. Blaker's office the next day. By then, he could not drive and was unable to walk without assistance. Before he performed any examination, Dr. Blaker told patient A that his shoulders and pelvis were "out of line."

Patient A was again wearing winter clothes and heavy work boots. Without having Patient A disrobe, Dr. Blaker pulled on his feet and manipulated his shoulders and lower back area. Dr. Blaker made no record of his analysis, treatment plan, or prognosis.

Patient A's pain grew progressively worse over the next few days. By February 6, 1994, the pain had become intolerable. That day, Patient A was taken by ambulance to The Johns Hopkins Hospital emergency room where he was examined by an attending trauma doctor and a neurologist. He told them that he had seen a chiropractor who had treated him for a slipped disc. Patient A was told that he was suffering from tremors related to his slipped disc, and was discharged.

Patient A's condition worsened. Eventually, he lost control of his bowels and bladder. On February 15, 1994, he returned to The Johns Hopkins Hospital emergency room. He was immediately diagnosed with acute cauda equina syndrome, a serious condition indicating that a mass is pressing on the cauda equina nerves. Diagnostic tests revealed a fast-growing tumor on Patient A's spinal column that was later diagnosed as an AIDS-related, non-Hodgkin's high grade lymphoma. Patient A underwent emergency surgery to remove the mass. He then underwent chemotherapy. Only after extensive physical therapy was he able to regain the full use of his legs.

The Board called Blaise Lavorgna, D.C. to testify as an expert witness in chiropractic. Dr. Lavorgna testified that he was familiar with the DNFT technique and had used it from time to time in his practice. He explained that the objective of chiropractic is to assess the patient to obtain a diagnosis and that, while chiropractors may use a variety of treatment techniques and methods, including DNFT, there are certain uniform standards of care that apply generally to chiropractic analyses and treatment of patients.

Dr. Lavorgna further testified that Dr. Blaker breached accepted standards of chiropractic care during each of Patient A's five visits by (1) failing to take a complete health history; (2) failing to perform and document an adequate physical

examination, including undertaking a basic visual analysis of the patient with his clothing removed and obtaining vital signs; (3) failing to perform neurological, diagnostic, and orthopedic tests; (4) failing to document properly the treatment that was performed on each visit; and (5) failing during the last two visits to diagnose that Patient A's pain was caused by a tumor. With respect to the charge of professional incompetence against Dr. Blaker, Dr. Lavorgna explained:

I believe when a person practices for whatever reason below the minimum standards of care that are accepted in the profession that they're practicing in an incompetent manner, so based on the fact that a lot of this stuff I stated was below what is traditionally expected and poorly documented, I have to feel that it was incompetently handled.

Dr. Blaker called R. Tyrrell Denniston, D.C. to testify as an expert in chiropractic and DNFT analysis. Dr. Denniston opined that Dr. Blaker's treatment of Patient A was competent and in conformity with the standard of care for chiropractors who use DNFT. He further opined that Patient A did not exhibit symptoms of a tumor, as opposed to symptoms of "disc involvement," during his two visits to Dr. Blaker in 1994. Dr. Denniston explained that practitioners who use DNFT rely only on the DNFT analysis to assess the patient's condition. Because the DNFT analysis is performed each time the patient presents for treatment, there is no need to plan a course of treatment or to make a prognosis. Dr. Denniston further stated that an accurate DNFT analysis and correction may be performed with the patient fully clothed. He also opined that Dr. Blaker was not required to order an MRI or a CAT Scan for Patient A during any of the office visits and that there was no cause for Dr. Blaker to refer Patient A to a medical professional.

Dr. Blaker also called Robert Douglas Keehn, M.D., an orthopedic surgeon, as an expert witness. Dr. Keehn explained that he had reviewed Patient A's medical records from The Johns Hopkins Hospital. He opined that, based on Patient A's symptoms and his test results from February 6, 1994, an x-ray or MRI study was not warranted at that time.

Dr. Keehn further opined that Patient A had no symptoms of cauda equina syndrome on February 6, 1994. In his opinion, the first symptoms of cauda equina syndrome appeared on February 15, 1994.

On February 8, 1996, the Board filed a 35 page memorandum opinion that included the following: (1) a synopsis of the case; (2) a list of exhibits; (3) a synopsis of witness testimony; (4) findings of fact; (5) conclusions of law; and (6) an order. By a majority of the quorum, the Board concluded that "in regard to the treatment and examination rendered to and notes taken for Patient A on five separate occasions, [Dr. Blaker] was professionally incompetent, in violation of § 3–313(9) of the Act."

Specifically, the Board determined that Dr. Blaker was professionally incompetent for failing to obtain a comprehensive health history of Patient A, namely, a history which would have included "the patient's account of past, present and familial health problems, allergies, surgeries and injuries." Dr. Blaker was also found professionally incompetent for failing to perform an adequate physical examination of Patient A, for failing to conduct appropriate orthopedic and neurological tests prior to making a diagnosis and initiating chiropractic treatment, and for failing to order pertinent diagnostic tests. The Board concluded, however, that Dr. Blaker was not professionally incompetent for failing to diagnose the non-Hodgkin's high grade lymphoma,[2] or for failing to use codes from the International Classification of Diseases.

The Board suspended Dr. Blaker's license to practice chiropractic for six months, stayed the suspension, and placed Dr. Blaker on probation for two years with the following conditions:

1. During the first six months of probation, [Dr. Blaker] shall complete by submitting evidence of completion to the Board, 48 hours of evaluation in physical diagnosis, in a

---

2. The Board did note, however, that with proper examination and diagnostic testing, Dr. Blaker could have determined whether a tumor was causing Patient A's pain.

course pre-approved by the Board and 24 hours of education in record-keeping in a course pre-approved by the Board; 2. Within the first year of Probation [Dr. Blaker] shall take and pass the Spec examination given by the National Board of Chiropractic Examiners with a passing grade of 75%.

3. [Dr. Blaker] shall have his practice monitored by a Board-pre-approved mentor who shall, once a week for the first month, every month for the next five months and then quarterly for the rest of the probationary period, assist [Dr. Blaker] in setting up a record-keeping system and observe that full examinations of patients take place which are properly recorded. [Dr. Blaker] is to pay for all costs relating to the mentor. The mentor shall submit a written report to the Board at the conclusion of each of the periods outlined above;

4. [Dr. Blaker] shall submit his records to a random review by the Board to determine whether the standards of care in record-keeping are being met.

On February 27, 1996, Dr. Blaker filed a petition for judicial review of the Board's decision and a motion to stay the Board's order pending judicial review in the Circuit Court for Baltimore County. On April 24, 1996, the court granted the motion to stay the Board's order. The court held a hearing on the petition on March 11, 1997. On July 7, 1997, the court issued a memorandum opinion and order affirming the decision of the Board. Thereafter, Dr. Blaker noted a timely appeal.

## STANDARD OF REVIEW

 Judicial review of a decision of an administrative agency is narrow. *United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994). A court reviewing the decision of an administrative agency must determine whether there is substantial evidence in the record as a whole to support the final decision of the agency. *Id.* at 577, 650 A.2d 226; *Human Relations Comm'n v. Mayor and City Council of Baltimore,*

86 Md.App. 167, 172–73, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). With respect to findings of fact, the reviewing court must not substitute its judgment for the expertise of the agency. *Maryland State Police v. Lindsey,* 318 Md. 325, 333, 568 A.2d 29 (1990). An administrative agency's decision "carries with it a presumption of validity; consequently, judicial review is limited to determining whether a reasoning mind could have reached the factual conclusion reached by the agency." *Liberty Nursing v. Dep't of Health & Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993).

■ Ordinarily, unlike an agency's findings of fact, an agency's conclusions of law are not given deference. The reviewing court may substitute its rulings of law for that of the agency. *Liberty Nursing,* 330 Md. at 443, 624 A.2d 941. When the issue before the reviewing court is one of law, the scope of review is quite broad. *Id.; Gray v. Anne Arundel Co.,* 73 Md.App. 301, 309, 533 A.2d 1325 (1987).

■ In considering the decision of the circuit court in reviewing the decision of an administrative agency, our function "is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review." *Mortimer v. Howard Research,* 83 Md.App. 432, 442, 575 A.2d 750, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990).

## DISCUSSION

### I.

■ Dr. Blaker contends that the agency action against him violated his constitutional right to due process of law because H.O. § 3–313(9) is "void for vagueness." Specifically, he argues that because H.O. § 3–319(9) does not define the term "professionally incompetent," the statute fails to give proper notice of the type of conduct that will subject a chiropractor to disciplinary measures, and is thus unconstitutional.

■ The vagueness doctrine stems from the Fourteenth Amendment's guarantee of procedural due process. *Williams v. State,* 329 Md. 1, 8, 616 A.2d 1275 (1992). Generally, courts

use two criteria to determine whether a statute is void for vagueness. *Bowers v. State*, 283 Md. 115, 120–21, 389 A.2d 341 (1978). First, a court must determine whether the statute adheres to the "fair notice principle." *Id.* at 121, 389 A.2d 341. In discussing the fair notice principle, the Court of Appeals has held that "[d]ue process commands that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Id.* Thus, a statute will survive a challenge that it is unconstitutionally vague if it uses plain language that is understandable to a person of ordinary intelligence. *Connally v. General Const. Co*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Williams*, 329 Md. at 8, 616 A.2d 1275; *Unnamed Physician v. Commission on Medical Discipline*, 285 Md. 1, 14–15, 400 A.2d 396, *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *Richards Furniture v. Board of County Commissioners*, 233 Md. 249, 264, 196 A.2d 621 (1964); *Boyer v. State*, 107 Md.App. 32, 42–43, 666 A.2d 1269 (1995), *cert. denied*, 341 Md. 647, 672 A.2d 622 (1996).

Second, a statute may be stricken for vagueness if it does not "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." [3] *Bowers*, 283 Md. at 121, 389 A.2d 341. The purpose behind this second prong is to avoid resolving matters in an arbitrary or discriminatory manner. *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)); *see also Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The vagueness doctrine does not require absolute precision or perfection, however. *Boyer*, 107 Md.App. at 42, 666 A.2d

---

3. Although not considered a penal statute, there is a punitive element to H.O. § 3–313 because it authorizes the Board to impose disciplinary measures against a licensed chiropractor who violates the statute's enumerated provisions. *See McDonnell v. Comm'n on Medical Discipline*, 301 Md. 426, 436, 483 A.2d 76 (1984) ("there is a punitive aspect to the [disciplinary] proceedings [of licensed professionals]. . . .").

1269. In other words, a statute is not void for vagueness "merely because it allows for the exercise of some discretion." *Bowers*, 283 Md. at 122, 389 A.2d 341. A statute is unconstitutional only when it "is so broad as to be susceptible to irrational and selective patterns of enforcement,...." *Id.*

In *Unnamed Physician v. Comm'n, supra,* the Court of Appeals addressed whether former Md.Code Ann. (1978 Cum. Supp.), Art. 43 § 130, which at that time governed disciplinary actions against physicians, was void for vagueness.[4] Former section 130(h) set forth eighteen separate grounds upon which a physician could be disciplined for "unprofessional conduct," one of which was "professional incompetency." The Court held that the statute was not void for vagueness because it (1) sufficiently "inform[ed] a physician that if he engage[d] in any of the activities forbidden by § 130(h) he [would] be subject to discipline and the possible loss of his license," *Unnamed Physician,* 285 Md. at 14–15, 400 A.2d 396, and (2) because it was written in plain language that could be understood by people of ordinary intelligence. *Id.* at 15, 400 A.2d 396.

Dr. Blaker contends that the holding in *Unnamed Physician* is inapplicable to this case because H.O. § 3–313(9), unlike former § 130(h), does not specify conduct so as to inform a chiropractor that he is at risk for disciplinary action. He argues that because he practices a form of chiropractic that is not practiced by the Board members and is not endorsed by the American Chiropractic Association ("ACA"),[5] H.O. § 3–313(9) denied him due process in that it did not place him on notice that he was required to use medical modalities or else risk revocation of his license. We disagree.

Although *Unnamed Physician* is not on all fours factually with the case before us, the analysis applied by the Court of

---

**4.** In 1981, Article 43 was recodified, in part, in the Health Occupations Article of the Maryland Code. Section 130(h) is now § 14-404 of that article.

**5.** Unlike DNFT, a form of straight chiropractic, the form of chiropractic endorsed by the ACA requires chiropractors to utilize medical modalities.

Appeals in that case controls our analysis here. In *Unnamed Physician,* as in this case, the Court had to decide whether the phrase professional incompetency in the statute rendered it void for vagueness. We now hold that the term "professionally incompetent" in H.O. § 3–313(9) is plain language commonly understood by members of the chiropractic community and, as such, does not render the statute void for vagueness.

In any profession, there are minimum standards of performance that must be met for a professional to practice in a competent manner.[6] The fact that a professional uses a technique or method different than that practiced by others in his profession does not release him from his obligation to operate in a professionally competent manner. "In common parlance, 'incompetence' means a lack of the learning or skill necessary to perform, day in and day out, the characteristic tasks of a given calling in at least a reasonably effective way. Competency does not mean perfection...." *Board of Dental Examiners v. Brown,* 448 A.2d 881, 883 (Me.1982). As discussed below, there is substantial evidence in the record to support the Board's finding that Dr. Blaker was professionally incompetent and that he violated H.O. § 3–313(9). The statute is not unconstitutionally void for vagueness.

## II.

Dr. Blaker next contends that there was insufficient evidence to support the Board's finding that he was professionally incompetent. He advances three arguments to support his contention: (1) the Board failed to consider Dr. Denniston's uncontradicted testimony that he did not violate the standard of care applicable to chiropractors who practice DNFT; (2) "the Board's finding that [he] was required to perform diagnostic testing on Patient A on January 28, 1994 and February 2, 1994 contradicts Dr. Keehn's testimony that no such testing was medically necessary ... during Patient A's visit to [The]

---

6. The Board did not have to find that Dr. Blaker committed malpractice in order to find that he was professionally incompetent under the Act.

Johns Hopkins [Hospital] emergency room"; and (3) there was no need for him to make or keep records of patient treatment, and his failure to do so was not "professional incompetence" because, as a practitioner of DNFT, he performs an analysis each time a patient visits. These arguments are not persuasive.

■ We note preliminarily that assessing the credibility of witnesses, resolving conflicts in the evidence, and determining the proper weight to assign to the facts in evidence are tasks within the province of the fact finder. *Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037 (1991). "The opinion of an expert witness, the grounds on which it was formed and the weight to be accorded it are for the trier of facts." *Great Coastal Express v. Schruefer*, 34 Md.App. 706, 724, 369 A.2d 118 (1977). When two experts offer conflicting opinions, the trier of fact must evaluate the testimony of both experts and decide which opinion, if either, to accept. *Quinn v. Quinn*, 83 Md.App. 460, 470, 575 A.2d 764 (1990).

■ In its role as fact-finder, the Board was free to accept or reject, in whole or in part, the evidence before it. In reaching its decision, the Board accepted that Dr. Blaker practices the DNFT technique of chiropractic but rejected his contention that, as a practitioner of DNFT, he is held to a standard of care different than that which applies to chiropractors who use "medical modalities." In so finding, the Board credited the testimony of Dr. Lavorgna and rejected that part of Dr. Denniston's testimony in which he opined that Dr. Blaker did not violate the standard of care of practitioners of DNFT. Dr. Lavorgna opined that the uniform standard of care for the practice of chiropractic in Maryland requires a chiropractor to take a comprehensive health history of a patient, perform a comprehensive examination, including orthopedic, neurological and diagnostic tests, diagnose a patient's problem as either medical or treatable through chiropractic measures, and clearly record a patient's treatment, treatment plan, and diagnosis. This standard applies to all practitioners, including those who practice DNFT. There is

no dispute that Dr. Blaker's treatment of Patient A fell below the standard of care articulated by Dr. Lavorgna. Dr. Lavorgna's expert testimony was itself sufficient evidence of Dr. Blaker's professional incompetency. Thus, based on Dr. Lavorgna's testimony and the sketchy records, there was substantial evidence to support the Board's finding that Dr. Blaker was incompetent in his record making and keeping practices.

## III.

Dr. Blaker next argues that his due process rights were violated because Roberta Gill, Esquire (the Board's counsel), and Paul Goszkowski, D.C. (the Board's Liaison) engaged in improper *ex parte* communications with the Board. He contends that Ms. Gill's and Dr. Goszkowski's representation of the Board at a pre-hearing conference on June 8, 1995 prohibited them from having further contact with members of the Board about Dr. Blaker's care, under Md.Code (1995 Repl. Vol.), State Government Article ("S.G."), § 10–219.

Section 10–219 provides, in relevant part:

(a) *Restrictions* —

(1) Except as provided in paragraph (2) of this subsection, a presiding officer may not communicate ex parte directly or indirectly regarding the merits of any issue in the case, while the case is pending, with:

(i) any party to the case or the party's representative or attorney; or

(ii) any person who presided at a previous stage of the case.

(2) An agency head, board, or commission presiding over a contested case may communicate with members of an advisory staff of, or any counsel for, the agency, board, or commission who otherwise does not participate in the contested case.

The Board does not dispute that Ms. Gill and Dr. Goszkowski attended the evidentiary hearing and the Board delibera-

tions that followed. Likewise, it acknowledges that during deliberations Ms. Gill discussed with the Board members the sanctions and penalties that legally could be imposed and that she prepared the Board's written Findings of Fact, Conclusions of Law, and Order. The Board argues that these communications fell into an exception to the rule against *ex parte* communications that permits an administrative agency to confer with its counsel. *See* S.G. § 10–219(a)(2). It argues further that Dr. Goszkowksi's and Ms. Gill's presence during the deliberations were not improper and that Ms. Gill's communication with the Board did not constitute "participat[ion] in the contested case," to which S.G. § 10–219(a)(2) refers. We agree.

 The record reflects that Dr. Goszkowski was present during the Board's deliberations but recused himself from participating in any discussions and from engaging in any decision-making. Indeed, the affidavit of Florence Blanck, D.C., on which Dr. Blaker rests his contention that improper communications took place, states only that Dr. Goszkowski "was present throughout the deliberations." There is nothing in the record to indicate that Dr. Goszkowski engaged in an *ex parte* communication with the Board.

 Likewise, there is no evidence in the record that Ms. Gill did anything other than provide legal counsel to the Board about the sanctions and penalties that it could impose. In so doing, and in preparing the Board's factual findings, legal conclusions, and order, Ms. Gill was acting in her advisory capacity as the Board's legal counsel, not as an advocate or a decision-maker.

Dr. Blaker argues that whether Ms. Gill was acting as an advisor or as an advocate is irrelevant because S.G. § 10–219(2) does not, in his words, "qualify, specify nor modify the nature of the prohibited participation, as an advocate or otherwise." He reasons, therefore, that Ms. Gill's participation in the pre-hearing conference automatically precluded her from communicating in any manner with the Board about this case. We do not read the statute so broadly. When read

in context, the word "participate," as used in S.G. § 10–219, means to assume the role of advocate or decision-maker at the time of the communication. Any other interpretation of that word would render the statute meaningless, as an administrative body would never be able to consult its counsel on any matter with which counsel was once involved, no matter how remote. *See Gisriel v. Ocean City Elections Board*, 345 Md. 477, 492, 693 A.2d 757 (1997)(a statute should not be interpreted so as to render any part of it meaningless, nugatory, or superfluous); *see also Fraternal Order of Police v. Mehrling*, 343 Md. 155, 180, 680 A.2d 1052 (1996), *cert. denied*, ——— U.S. ———, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998); *Mazor v. Department of Correction*, 279 Md. 355, 360, 369 A.2d 82 (1977); *Subsequent Injury Fund v. State Roads Commission*, 35 Md.App. 353, 355, 370 A.2d 597 (1977). Ms. Gill did not "participate" in the case at the time she was consulted by the Board. As such, S.G. § 10–219(a)(2) allowed her to do her job, *i.e.*, to provide legal advice and assistance to the Board.

## IV.

■ Dr. Blaker maintains that the Board considered evidence beyond the scope of the charging document and sanctioned him for conduct not included in the charges against him. He maintains that the following testimony warrants reversal of the Board's order:

MR. CAREY: Dr. Blaker, would you say that the type of notes that you've taken in this case that we've seen in evidence here are typical of the type of notes that you generally take.

THE WITNESS: Yes.

MR. WEBER: Objection. That's not at issue here. We are dealing with the case of [Patient A] alone.

DR. KLINGLER: Overruled. Answer the question.

WITNESS: I did.

Dr. Blaker argues that "[t]he entire offense alleged against [him] was changed when the Board considered an entirely different act of other alleged improper note-taking with re-

gard to other parties at different times." He contends that this testimony is inextricably linked to the Board's conclusion that he failed to keep adequate notes and records of Patient A, as is evidenced by the Board's statement in its Conclusions of Law that "[Dr. Blaker] indicated that he has treated thousands of patients and that all of his records are similar to the scanty ones kept on Patient A."

Assuming, without deciding, that the Board erred in allowing this line of questioning, Dr. Blaker must demonstrate that the Board's error prejudiced him to warrant reversal. *See Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977); *Baker v. Miles & Stockbridge,* 95 Md.App. 145, 161, 620 A.2d 356 (1993). "An error is prejudicial if it affected the outcome of the case." *Baker,* 95 Md.App. at 161, 620 A.2d 356; *see also I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 11–12, 344 A.2d 65 (1975) ("[an appellate court] will not reverse for an error by the lower court unless the error is 'both manifestly wrong and substantially injurious.'") (quoting *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A.2d 258 (1962)). An error that does not affect the outcome of a case is harmless. *I.W. Berman Prop.,* 276 Md. at 12, 344 A.2d 65.

The record in this case makes plain that the Board's reference to other patients' records did not prejudice Dr. Blaker. As the circuit court noted, the testimony about his general note-taking and record-keeping practices was one of many questions posed to Dr. Blaker and others regarding the treatment that Patient A received. There was ample testimony to support the Board's conclusion that Patient A's records, in particular, were inadequate. In addition to Dr. Lavorgna's testimony about the deficiencies in those records, Dr. Denniston stated that even he records a patient's complaints and treatments. In fact, the Board refers to Dr. Denniston's testimony to support its legal conclusions by stating that "[Dr. Blaker's] note-taking [of Patient A] was so woefully inadequate that Dr. Denniston could not understand [Dr. Blaker's] use of the term 'lymph.'" Moreover, the first line of the Board's Conclusions of Law states that its finding of professional incompetence is based solely upon Dr. Blaker's treat-

ment of Patient A. As Dr. Blaker has not shown that he was prejudiced by any error on the part of the Board, we find his argument to be without merit.

## V.

 Dr. Blaker contends that the Board exceeded its authority when it placed four conditions on his probation. He argues that at the time the Board issued its order, H.O. § 3–313 expressly authorized the Board to place a licensee on probation, but that it did not give the Board the authority to impose conditions on the probation. In support of this argument, Dr. Blaker cites to the 1996 amendment to H.O. § 3–313.

In 1996, the General Assembly amended H.O. § 3–313 to include language stating that the Board may place a licensee on probation with or without conditions. *See* 1996 Md. Laws 528.[7] Dr. Blaker argues that this enactment confirms that the Board lacked authority to impose conditions on probation under the statute in effect when the Board issued its order in his case. He further argues that because H.O. § 3–313 is punitive in nature, any sanctions imposed must be strictly construed against the Board. We disagree.

In *Lussier v. Md. Racing Commission,* 343 Md. 681, 686, 684 A.2d 804 (1996), the Court of Appeals rejected the argument that an administrative agency lacks authority to impose a particular civil penalty for misconduct absent the express authority to do so. The Court explained that "in determining whether a state administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling." *Id.*

---

7. The current version of H.O. § 3–313 provides:
 Subject to the hearing provisions of § 3–315 of this subtitle, the Board may deny a license to any applicant, reprimand any licensee, place any licensee on probation, *with or without conditions,* or suspend or revoke a license, or any combination thereof. . . .
 Md.Code (1997 Cum.Supp.), § 3–313 of the Health Occ. Article. (emphasis added).

Under *Lussier*, it is clear that the Board had the authority to place conditions on Dr. Blaker's probation. Without the ability to place terms and conditions on an order of probation, the Board would be unable to monitor licensees and to protect the public from harm. *See McDonnell v. Comm'n on Medical Discipline*, 301 Md. 426, 436, 483 A.2d 76 (1984). In other words, the Board's power to sanction licensees with probation would be rendered meaningless. We agree with the circuit court that the General Assembly's decision to include the phrase "with or without conditions" in H.O. § 3–313 simply clarified the extent of the Board's authority. Consequently, the Board acted within its statutory authority in imposing the four conditions on Dr. Blaker's probation.

## VI.

 Finally, Dr. Blaker contends that he was prejudiced in his defense by the Board's refusal to grant him access to non-public Board orders relating to prior cases of alleged incompetence. In support, he cites *Montgomery Co. v. Anastasi*, 77 Md.App. 126, 137–39, 549 A.2d 753 (1988), in which we held that an alleged deviation from an administrative agency's prior decision constitutes an arbitrary and capricious act. He argues that the Board's refusal to allow him full discovery of the requested documentation "barred him from determining if the action taken against him constitutes an unexplained deviation from prior Board decisions."

Section 10–617(h) of the State Government Article pertains to the inspection of records of licensed professionals:

*Licensing Records.*—(1) Subject to paragraphs (2) through (4) of this subsection, a custodian shall deny inspection of the part of a public record that contains information about the licensing of an individual in an occupation or profession.

(2) A custodian shall permit inspection of the part of a public record that gives:

(i) the name of the licensee;

(ii) the business address of the licensee or, if the business address is not available, the home address;

(iii) the business telephone number of the licensee;

(iv) the educational and occupational background of the licensee;

(v) the professional qualifications of the licensee;

(vi) any orders and findings that result from formal disciplinary actions;

(vii) any evidence that has been provided to the custodian to meet the requirements of a statute as to financial responsibility.

(3) A custodian may permit inspection of other information about a licensee if:

(i) the custodian finds a compelling public purpose; and

(ii) the rules or regulations of the official custodian permit the inspection. . . .

As S.G. § 10–617(h) makes clear, the Board is required to allow the inspection of *public* orders only. There is an additional limitation to that inspection in that, other than the name, address, and occupational and educational background of a licensee, only public orders that have resulted in formal disciplinary measures may be reviewed. S.G. § 10–617(h)(2)(vi). In the instant case, Dr. Blaker contests the Board's refusal to allow him to inspect non-public orders concerning non-formal charges of incompetency. Section 10–617 forbids the Board from releasing the specific information that Dr. Blaker requested. We thus find his argument that he was prejudiced by the Board's action to be without justification.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**