Circuit Court for Baltimore County
Case No. 03-C-15-012485

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1030

September Term, 2016

_____

THEODORE PRIESTER, JR.

v.

BOARD OF APPEALS OF
BALTIMORE COUNTY

_____

Wright,
Nazarian,
Arthur,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: July 27, 2017

A Baltimore County fire captain sexually harassed numerous female subordinates and created a hostile work environment in which employees were afraid to report his misconduct. After the captain's conduct came to light, the fire department terminated his employment. He applied for retirement benefits.

The Board of Trustees of the Employees' Retirement System denied the captain's application on the ground that he had not rendered "honorable and faithful service as an employee," a condition for the receipt of benefits under the Baltimore County Code. The Baltimore County Board of Appeals affirmed that determination, and the Circuit Court for Baltimore County affirmed the Board of Appeals.

The captain appealed to this Court. We affirm.

<u>**FACTUAL AND PROCEDURAL HISTORY**</u>

**A. Captain Priester**

Theodore C. Priester, Jr., joined the Baltimore County Fire Department in 1982. He received many commendations throughout his career, including a Silver Star for heroic conduct in fighting a fire. He became a lieutenant in 1992 and a captain in 1999. By March of 2013, he had acquired the rank of Fire Captain and was in charge of Fire Station 18 in Randallstown.

**B. The "Bathroom Incident"**

At Station 18 the downstairs bathroom had been designated as the women's bathroom. Notwithstanding that designation, Captain Priester would sometimes use the downstairs bathroom.

Kathleen Duncan-Fulton, an Emergency Medical Technician (or "EMT"), was sometimes responsible for cleaning the women's bathroom. On several occasions, she had complained to a superior officer about Captain Priester's use of the women's bathroom. According to EMT Duncan-Fulton, Captain Priester would not flush the toilet or clean up after himself, and he would leave the bathroom in what she called a "disgusting" condition.

On the afternoon of March 15, 2013, Captain Priester, who is over six feet tall and weighs more than 300 pounds, leaned over EMT Duncan-Fulton in the station's kitchen and, in a loud voice, demanded to know whether she had complained about him using the downstairs bathroom. She said, yes. He responded: "This is my house, and I'll shit wherever I want." He added that she was "supposed to clean the bathroom and like it." He threatened to remove her from duty if she refused to clean the bathroom. A number of employees witnessed some or all of this exchange.

EMT Duncan-Fulton told Captain Priester that he was creating a hostile work environment because of his tone of voice. He ordered her to meet him in his office.

When EMT Duncan-Fulton met with the captain in his office a few minutes later, he denied that he had yelled her. He said: "[E]verybody here's going to be a witness that I didn't yell at you the way you're saying I did." She responded: "You're absolutely right. They'll take your side because you let them do whatever the fuck they want." He told her to leave, and she did.

EMT Duncan-Fulton was extremely upset by Captain Priester's aggressive demeanor and his threat to remove her. She called a superior officer, Captain Thomas Hoffman, who intervened and obtained an apology from Captain Priester.

On the following day, EMT Duncan-Fulton met with Captain Hoffman and Captain Franklin E. Penn Jr. In that meeting she reported that Captain Priester had begun to complain about her job performance after she resisted his unwelcome advances.

## C. The Investigation

EMT Duncan-Fulton's complaint prompted an internal investigation. In the meantime, on March 22, 2013, Captain Priester was summarily suspended from duty.

The investigation uncovered allegations that Captain Priester had sexually harassed numerous female employees, as well as at least one civilian. The alleged harassment occurred while the captain was on duty and, in many instances, in the presence of other employees.

At the close of the investigation, on April 9, 2013, the fire department issued a notification of charges, which summarized the allegations against Captain Priester. In total, the captain was charged with 19 violations of the fire department's rules and regulations and two violations of County rules. The charges included violations of multiple departmental regulations concerning a captain's duty, a violation of the fire department's fair practices policy, and a violation of the County's sexual harassment policy.[1]

---

[1] "Priester's Notice of Charges reported that 'while visiting the funeral home for the father of a shift member, Priester told the shift members present the names of each

3

**D. The Termination of Captain Priester's Employment**

The Department's Administrative Hearing Board held a hearing on the charges against Captain Priester on April 30, 2013. Although the captain had initially protested that he had "been falsely accused" of sexually harassing female employees, he advised the board that he wished to plead no contest and to submit a letter expressing remorse.

In his letter Captain Priester expressed regret and remorse, apologized "for any negative light shown on the department," and asked for "due consideration" for his faithful service throughout his career. He wrote:

> Obviously, had any person advised me that they took offense to personal actions, comments, or gestures I would have immediately ceased and desisted. I have always been of a joking and flirtatious character. The Fire Department has changed drastically over these past 30 years. Sadly I must admit, that while climbing the infamous "Dinosaur List" the department has left me behind. I realize that the responsibility falls completely to me to keep up with the changing times. I am especially accountable in my rank of Fire Captain and held to a higher standard.

At another point in the letter, Captain Priester referred to the "horseplay, hazing, practical jokes, and basic clowning around of the 'old fire department.'" He expressed his desire to be allowed to retire.

---

complainant and indicated they would pay for it.'" *Priester v. Baltimore Cnty.*, 232 Md. App. 178, 184 n.2 (2017). "The Notice stated further that he 'indicated he had an attorney and would be back to work Saturday (presumed to be April 6, 2013)[,]' and that 'he was going to make their lives miserable (referring to the complainants).'" *Id.* "The Notice characterized his behavior as 'a direct and blatant effort to intimidate the witnesses.'" *Id.*

The board found Captain Priester guilty of 19 of the 21 charges against him and recommended that his employment be terminated. The Fire Chief, John J. Hohman, accepted that recommendation.

On the following day, May 1, 2013, Captain Priester exercised his right, under the County Code, to appeal the decision to terminate his employment. In a letter to Chief Hohman, Captain Priester asked for permission to retire. While apologizing "for any embarrassment" that he had caused the department and expressing his understanding that he "must face some form of discipline," Captain Priester appeared to question the bona fides of his accusers:

> [I]f one single individual had ever said they were offended I assure you behavior modification would have been immediate. Certainly an individual should not be able to hold-back on issuing a complaint (2 years) until such time [as] they are in trouble. Also to have the same individual recruit additional complainants and have identical language is suspect as well.

The department formally terminated Captain Priester's employment on May 16, 2013.[2]

---

[2] Captain Priester's challenge eventually came before the Personnel and Salary Advisory Board ("PSAB"). The PSAB deadlocked, with two members voting for termination and two voting for reinstatement. The PSAB notified Captain Priester that it would rehear his grievance, but before a new hearing was scheduled, he filed suit in the Circuit Court for Baltimore County, asking the court to order the PSAB to issue its tied vote as a final order and to reinstate him as an employee. The circuit court granted summary judgment in favor of the County. Captain Priester appealed. We held that, because "the board ha[d] not yet issued a final order and plans to rehear the appeal, Priester ha[d] not exhausted his administrative remedies, and his action d[id] not fall within a recognized exception to the exhaustion doctrine." *Priester v. Baltimore Cnty.*, 232 Md. App. at 183. Therefore the circuit court should have dismissed the appeal. *Id.*

### E. The Application for Retirement Benefits

On July 31, 2014, Captain Priester filed an application for retirement in which he sought pension benefits. The Trustees of the Employees' Retirement System met on December 9, 2014, and voted 4-1 to deny the application.

Writing for the Trustees, the Director of the County's Office of Budget and Finance explained that, to qualify for retirement benefits (i.e., "a service retirement allowance") under the Baltimore County Code, an employee must accumulate a certain period of "creditable service." *See* Balt. County Code § 5-1-213. The Code defines "creditable service" as "prior service," such as service in the armed forces of the United States, plus "membership service." *Id.* § 5-1-201(i). The Code, in turn, defines "membership service" as "honorable and faithful service as an employee rendered while a member of the retirement system." *Id.* § 5-1-201(p). The Trustees reasoned that Captain Priester's service "was not honorable and faithful and is therefore not creditable towards a retirement allowance."

### F. Appeal to the Baltimore County Office of Administrative Hearings

Captain Priester exercised his right to appeal the Trustees' decision to the Baltimore County Office of Administrative Hearings ("OAH"). The OAH held four days of hearings between February 23, 2015, and May 28, 2015.

#### 1. EMT Duncan-Fulton's Testimony

At the hearing, EMT Kathleen Duncan-Fulton testified that, after Captain Priester arrived at Fire Station 18 in 2010, he would periodically approach her from behind while

6

she was washing dishes or working at a computer. He would "nibble" on her neck and ear, use crude language to tell her that he thought that she was sexually aroused, and make other lewd and sexually suggestive comments. On other occasions, when he was in a room with her and other employees, he would call her name, put his hands to his face, and make a crude gesture that is meant to signify cunnilingus.

She said that Captain Priester would engage in this behavior "at least once a day on the two days that [she] would see him and over a span of several months." After several months, she told him to stop. Shortly thereafter, he began to complain about her job performance.

EMT Duncan-Fulton testified that she did not immediately report the harassment because she had been employed with the department for only nine or ten years, as opposed to Captain Priester's 30 years. In her view, it was "a little difficult to think that somebody [was] going to take [her] side and believe [her]." After the "bathroom incident," however, she "finally had enough" and decided to notify Captains Penn and Hoffman.

Baltimore County submitted a written statement that EMT Duncan-Fulton made to the investigators. The statement corroborated the EMT's testimony and included additional details. For example, she wrote that when Captain Priester would approach from behind while she was working, he would press her against the counter. She also wrote that she attempted not to "enter a room if he was alone" and that she "would leave the room if Capt. Priester appeared to be approaching [her]."

7

### 2. The Testimony of Captains Penn and Hoffman

Captains Penn and Hoffman corroborated EMT Duncan-Fulton's account of previous complaints about Captain Priester's misuse of the women's bathroom. Both captains said that they had never had any problems with EMT Duncan-Fulton's job performance.

### 3. Lieutenant Stevens's Testimony

Lieutenant Michelle Stevens testified that Captain Priester was her captain for six to eight months when he was assigned to a different station. She testified that while she was working at a computer, Captain Priester would "put his hand on [her] leg and run it up [her] thigh." She would tell him to "knock it off" or "say please don't do that" or try to "laugh it off."

The lieutenant "tried to not put [her]self in situations" where she could be subject to Captain Priester's harassment. In an attempt to protect herself, she said that she did not go into closed rooms with Captain Priester.

During firefighting operations, Captain Priester would "pat her butt" or behave inappropriately by touching women. He would call her "toots," to which she would reply, "[C]all me Lieutenant Toots[.]"

Lieutenant Stevens said that Captain Priester would make inappropriate gestures to make others laugh. She said that people would laugh because they did not want to be "singled out."

When asked whether she thought that Captain Priester was just joking, Lieutenant Stevens said that he might have been, but that he did not stop once he was told to stop.

8

She added that he was in the position of power. She had begun as an EMT and had gotten promoted to the position of fire-suppression officer, and she believed that he did not want her "on the fire side."

Lieutenant Stevens said that she did not immediately report Captain Priester's harassment because she did not "want to be labeled." She stated that it was difficult for women to report harassment in the Baltimore County Fire Department and that she reported Captain Priester's harassment only after she was questioned by Battalion Chief Peter Hill. On cross-examination, she explained that the department is "a paramilitary organization." "You go to your Captain first for everything."

In a letter to Battalion Chief Hill, which was admitted into evidence at the hearing, Lieutenant Stevens wrote that she "struggled with the decision" to reveal any issues with Captain Priester, because it was difficult to be a woman, and a woman fire-suppression officer, in the Baltimore County Fire Department. Like EMT Duncan-Fulton's written statement, Lieutenant Stevens's letter corroborated her testimony and included additional details. She wrote that Captain Priester would breathe on her neck, kiss her neck, and whisper in her ear and that he would breathe heavily when she answered a telephone call that he had placed. Other employees would laugh when they witnessed his conduct.

Lieutenant Stevens would "try to laugh it off too," because she did not want to be (in her words) "shunned" and did not "want a 'label.'" In her testimony, she said, "I'm labeled now."[3]

---

[3] In addition to introducing Lieutenant Stevens's letter, the County introduced a memorandum of an interview that Lieutenant Barbara Greenfeld conducted during the

9

## 4. Lieutenant Greenfeld's Testimony

EMT District Lieutenant Barbara Greenfeld testified that, shortly after she heard about the confrontation between Captain Priester and EMT Duncan-Fulton, she reported two instances in which she was a victim of his sexual harassment.

In the first incident, which occurred in 2012, she was on a call with Captain Priester. While they were loading a patient on a stretcher into an ambulance, she climbed onto the first step. Captain Priester put his hand on her ankle and ran it up her leg into the vicinity of her crotch. His conduct elicited laughter from some of the men who were present. She said nothing, but finished loading the patient into the ambulance.

The second incident occurred in 2013, when Lieutenant Greenfeld was conducting a training session for about eight people. She was seated with a computer in front of her. Captain Priester came up from behind her and put his lips all over her face and ear. She screamed. Everyone else laughed and acted as though it was a big joke. As a result of that incident, she stopped visiting Station 18, would not let Captain Priester get behind her, and tried to protect herself when she had to respond to emergency calls with him.

When asked why she did not report Captain Priester after he had inappropriately touched her, she explained:

> The Fire Department people work very closely with one another. You depend on them to be there to protect your back, to support one another. . .

investigation of Captain Priester's conduct. The letter corroborated Lieutenant Stevens's testimony and included additional details that suggest a kind of pattern or practice of harassment. Like EMT Duncan-Felton, Lieutenant Stevens reported that Captain Priester would push his body against hers, would make suggestive comments similar to those that EMT Duncan-Fulton reported, and would call her from across a room and make a crude gesture signifying cunnilingus.

[T]here's not any part of that job you could do by yourself. You have to have other people to help you do that job. And you don't want to alienate those people by being the tattletale . . . the person that turns . . . someone in and gets them in trouble.

When asked whether she had some particular concern about what might happen in a firefighting operation if she reported Captain Priester, Lieutenant Greenfeld responded:

I've had Captains before that have ordered their crews not to help a certain person. You know, I'm telling you right now do not help that person. And when you're on an emergency incident . . . you need that help. You need that backup. You need . . . people that you trust to have your back if things get ugly.

On cross-examination, Lieutenant Greenfeld testified that inappropriate conduct was commonplace in the department when she began her career in 1986, but that Captain Priester was the only supervisor who had ever touched her. She said that she felt embarrassed when Captain Priester grabbed her from behind, especially because so many people were present. She believed that Captain Priester engaged in such behavior "to show everybody" that he was the captain and could "do whatever [he] want[ed] to do."

### 5. Paramedic Kelly's Testimony

Paramedic Amber Kelly testified that, when she was a student and not yet a member of the department, Captain Priester "would come up behind [her] and put his hands on [her] shoulders and rub [her] shoulders and down into [her] back and neck." On one occasion, Captain Priester "placed his hand on [her] knee and slip[ped his hand] up slightly[,] approximately an inch toward [her] thigh." Other times, she said, "he would come up behind [her] and whisper in [her] ear," and he would take a "large breath in . . .

11

order to blow into [her] ear." If she felt uncomfortable, she would move to another seat or to a different room to avoid Captain Priester.

Paramedic Kelly said that she did not report the incidents because she was in training and, fearing retaliation, thought that it might prevent her from being hired. She believed that Captain Priester had some influence over whether she would be hired.[4]

### 6. Paramedic Glenn Harris's Testimony

Paramedic-Firefighter Glenn Harris testified that, before the "bathroom incident" between Captain Priester and EMT Duncan-Fulton, she had confided to him on several occasions that Captain Priester had "touched" her. She expressed concern about the "aggressive" and "uncomfortable" environment in the station. She had also expressed concern about Captain Priester's use of the women's bathroom and the condition in which he left it.

Paramedic Harris had witnessed an incident, about two and a half years earlier, when Captain Priester leaned onto the rails of Paramedic Kelly's chair and asked her for a light. He saw her stiffen up and tell him that she would give him a light, but to back off.

On the day of the "bathroom incident," Paramedic Harris observed part of the confrontation between Captain Priester and EMT Duncan-Fulton. He said that EMT Duncan-Fulton seemed to be "fearful" and in a "panic," while Captain Priester "was more

---

[4] It appears that Paramedic Kelly did relate her concerns to her preceptor, Paramedic Glenn Harris. Paramedic Harris offered to assist her, but she made it clear to him that she wanted to handle the matter on her own.

12

agitated and angry." He observed EMT Duncan-Fulton "moving about the room . . . to get away" from Captain Priester.

According to Paramedic Harris, a nursing technician at Northwest Hospital (whom he described as a "rock solid person")[5] became enraged as a result of an encounter with Captain Priester. The technician complained to him that Captain Priester had touched her inappropriately and made suggestive comments to her while he was escorting a patient to the hospital. Paramedic Harris called Lieutenant Greenfeld to alert her to what had occurred and to seek guidance. Lieutenant Greenfeld corroborated his account in her testimony, saying that Paramedic Harris had called her and asked her to come to Northwest Hospital because Captain Priester was "'at it again' with either a nurse or a tech[nician]."[6]

Paramedic Harris also testified that during Captain Priester's suspension several members of Station 18 attended a funeral for a relative of one member. While at the

---

[5] Paramedic Harris explained the factual basis for his characterization: "She's one of these people where I've actually seen patients spit in her face before and she's always got the calm demeanor."

[6] The County introduced an internal memorandum that Paramedic Harris prepared during the investigation of Captain Priester's misconduct. In the memorandum Paramedic Harris reported that the nursing technician was "animated and hostile" and that she "cornered [him] and began shouting loudly." He initially thought that she might have been "experiencing a diabetic episode or head trauma." He wrote that she "began by screaming at me that I needed to control one of mine and that he was never going to touch or speak to her like that again." It took Paramedic Harris several minutes to calm her down enough so that she could explain what had happened.

funeral, Captain Priester named several of his accusers and said that "they better watch out." He added, "That's a threat."[7]

### 7. Fire Chief Hohman's Testimony

At the time of the hearing in 2015, Fire Chief Hohman had spent 38 years in the department. He had been the chief for 15 years. In that capacity he reviewed every disciplinary decision in the department. Earlier, he had served for eight years as the union representative who defended employees against disciplinary charges.

When asked for his opinion about Captain Priester's work performance, Chief Hohman stated that the captain "had a long-standing tendency to abuse power and authority and to curry favor with the people that worked with him by . . . not enforcing the rules." To his knowledge, no other officer had been disciplined as frequently as Captain Priester: his record was the worst of any officer that the chief had ever seen. On one occasion, the chief had demoted Captain Priester, but the demotion was overturned on appeal.

Captain Priester's prior infractions involved giving "preferential treatment" to some members of his team. "If they were on his team," the chief said, "they didn't have to follow the rules that everyone else followed." Some of the infractions entailed false statements that were made to assist favored employees in obtaining sick leave.

---

[7] *See supra* n. 1. Paramedic Harris listed three department members who were present when Captain Priester made those comments. During the internal investigation, each of those members denied any knowledge of inappropriate conduct by Captain Priester. Although the transcript of Paramedic Harris's testimony is of poor quality, the Baltimore County Board of Appeals wrote that he quoted Captain Priester as saying, "those bitches better watch out."

14

Chief Hohman regarded Captain Priester's conduct, as reported by the complaining witnesses in this case, as "the ultimate abuse of power and authority." The captain had "denigrat[ed] other employees" and made employees "afraid to do their jobs." He deemed it "unconscionable" that Lieutenant Greenfeld was afraid to conduct training sessions at Captain Priester's station because "she didn't want to be subjected to his behavior."

Because of the "power and authority" that a captain wields at a fire station, Chief Hohman said that he "could understand why somebody would not come forward" and complain of sexual harassment. He said that the captain's intimidation of women created the "worst possible" image of the department.

According to Chief Hohman, the department had been conducting training to combat sexual harassment since the 1980s. Hence Captain Priester had undoubtedly been taught that his conduct was against the law.

Chief Hohman concluded that, in his view, Captain Priester's service was not honorable and faithful.

### 8. Captain Priester's Testimony

Captain Priester testified on his own behalf. Although he had expressed remorse, pleaded no contest to the employment charges against him, and depicted himself as a "[d]inosaur" who had failed to "keep up with the changing times," he said that he had

done so on the premise that the union would work out a deal under which he could retire and receive his entire pension. He denied the allegations against him.[8]

### 9. The ALJ's Decision

On June 12, 2015, an administrative law judge ("ALJ") issued an opinion and order, in which he affirmed in part, and reversed in part, the decision of the Trustees of the Employees' Retirement System.

Crediting the testimony against Captain Priester, the ALJ found that his service was not "honorable and faithful," because it represented an abuse of his position as a captain. On that basis, the ALJ concluded that Captain Priester's service as a captain, from 1999 until the date of his termination in 2013, did not qualify as "creditable service." Accordingly, the ALJ ordered that Captain Priester would be "entitled to receive a service retirement allowance from Baltimore County, and the 'number of years of credible [sic] service' . . . shall not include that period of time during which [Captain Priester] held the rank of Captain." The ALJ's ruling resulted in a forfeiture of some, but not all, of Captain Priester's pension.

## G. Proceedings Before the Board of Appeals

Neither side was satisfied with the ALJ's Solomonic decision. Both sides appealed.

---

[8] Both parties called a number of other witnesses, but their testimony is largely immaterial to the legal issues on this appeal. Captain Priester's witnesses included several of his subordinates, who denied any knowledge of sexual harassment and, in one instance, attacked the bona fides of one of the captain's accusers. Testifying for the County, Battalion Chief Peter Hill said that similar denials, during the investigation, reflected a culture of faithfulness to the captain.

16

In his appeal Captain Priester did not dispute the facts that were presented before the ALJ, but focused on what he regarded as flaws in the process, including the alleged vagueness of the terms "honorable and faithful." For its part, the Employees' Retirement System contended that the ALJ did not have the authority to revoke only part of the pension.

On October 16, 2015, the Board issued an opinion and order, in which it affirmed the finding that Captain Priester had not rendered "honorable and faithful" service, but reversed the conclusion that he could receive a pro-rated portion of his pension. The Board found "no precedent allowing the ALJ to deny pension benefits for only part of Mr. Priester's employment with Baltimore County." Accordingly, the Board denied Captain Priester's entire claim for pension benefits.[9]

## H. Judicial Review in the Circuit Court

Captain Priester petitioned for judicial review of the Board's decision in the Circuit Court for Baltimore County. On June 20, 2016, the court signed a written order in which it upheld the Board's decision. Captain Priester filed a timely notice of appeal on July 19, 2016.

<u>QUESTIONS PRESENTED</u>

Captain Priester raises the following four questions:

1. Is the undefined term "honorable and faithful" service, which may restrict pension entitlement, so impermissibly vague that it must be struck down?

---

[9] At oral argument, the parties confirmed that the County would return the contributions that Captain Priester himself had made to fund his retirement.

17

2. If the term "honorable and faithful" service is not impermissibly vague, was it applied by the Board in an arbitrary and capricious manner, inconsistent with the County pension statute and the relevant case law?

3. Is the Board's decision, which revoked and forfeited Mr. Priester's entire County pension inconsistent with the plain and unambiguous language of the pension statute and pension case law?

4. Should the Board's decision be reversed because it was not supported by substantial evidence in the record?

For the following reasons, we answer each question in the negative. Consequently, we shall affirm the circuit court's judgment affirming the decision of the Board of Appeals.

## DISCUSSION

### I. Standard of Review

This Court exercises a "narrow" role when it reviews an administrative agency's decision. *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67 (1999). Our role is "'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions'" and whether "'the administrative decision is based on an erroneous conclusion of law.'" *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 573 (2015) (quoting *United Parcel Serv., Inc. v. People's Counsel for Baltimore Cnty.*, 336 Md. 569, 577 (1994)). The reviewing court "must affirm the agency decision if there is sufficient evidence such that 'a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Id.* (quoting *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160 (2005)).

"[T]he agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.'" *Bd. of Physicians Quality Assurance v. Banks*, 354 Md. at 68 (quoting *CBS Inc. v. Comptroller of the Treasury*, 319 Md. 687, 698 (1990)). In general, however, the reviewing court exhibits no such deference where it determines that the agency decision is based on an erroneous conclusion of law. *See Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 568-69 (1998).

## I. The Code Provision Is Not Void for Vagueness

As an implicit corollary to the prohibition against the deprivation of life, liberty, or property without due process of law, the Fourteenth Amendment invalidates legislation that is unduly vague. *See*, *e.g.*, *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. 577, 591 (2004); *Williams v. State*, 329 Md. 1, 8 (1992); *Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. 243, 255 (1998). Captain Priester contends that the pertinent Code provisions are "void for vagueness" because of the absence of a statutory or regulatory definition of the key terms "faithful" and "honorable." We reject his contention.

"Generally, courts employ two criteria in their analysis of whether a statute is void for vagueness." *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 591 (citing *Bowers v. State*, 283 Md. 115, 120-21 (1978)); *accord Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 255-56.

First, a court determines whether the statute gives fair notice, as "'[d]ue process commands that persons of ordinary intelligence and experience be afforded a reasonable

19

opportunity to know what is prohibited, so that they may govern their behavior accordingly.'" *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 591-92 (citing *Bowers v. State*, 283 Md. at 121); *Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 256. "[A] statute will survive a challenge that it is unconstitutionally vague if it uses plain language that is understandable to a person of ordinary intelligence." *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 592; *accord Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 256.

Second, a court determines whether the statute "'provide[s] legally fixed standards and adequate guidelines for police, judicial officers, triers of fact, and others whose obligation it is to enforce, apply and administer the penal laws.'" *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 592 (quoting *Bowers v. State*, 283 Md. at 121); *accord Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 256.[10] "A statute, however, is not void for vagueness 'merely because it allows for the exercise of some discretion.'" *Finucan v. Md. Bd. of Phys. Quality Assurance*, 380 Md. at 592 (quoting *Bowers v. State*, 283 Md. at 122); *accord Blaker v. State Bd. of Chiropractic Examiners*, 123 Md. App. at 256-57. "A statute is unconstitutionally vague only when it 'is so broad as to be susceptible to irrational and selective patterns of enforcement.'" *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 592 (quoting *Bowers v. State*, 283 Md. at 122); *accord Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 257.

---

[10] Although section 5-1-201(o) of the Baltimore County Code is not a criminal law, we assume for the sake of argument that it is punitive to the extent that it envisions the denial of a pension benefits to a person whose service was not honorable or not faithful.

20

"The vagueness doctrine does not require absolute precision or perfection[.]" *Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 256. "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Williams v. State*, 329 Md. at 10 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975)).

Thus, for example, Maryland courts have rejected void-for-vagueness challenges to statutes under which a physician could be disciplined for "immoral or unprofessional conduct," *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 591-95; or for "unprofessional conduct," which included "professional incompetency," *Unnamed Physician v. Comm'n on Med. Discipline*, 285 Md. 1, 14-15 (1979); *see also Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 258 (rejecting vagueness challenge to statute that permitted discipline of chiropractor for "professional incompetency"). Similarly, the Court of Appeals rejected a vagueness challenge to a criminal child-abuse statute that defined "abuse" as "physical injury sustained as result of cruel or inhumane treatment," *Bowers v. State*, 283 Md. at 127-28; and to a criminal statute that defined a "drug kingpin" as someone who occupied the position of "organizer, supervisor, financier, or manager" in a drug conspiracy. *Williams v. State*, 329 Md. 1, 8-12 (1992).

Captain Priester complains that the County Code does not define the terms "honorable" and "faithful" and that the Trustees have not propounded a regulatory definition. "Honorable" and "faithful," however, "are not technical terms; rather they are common words with well understood meanings." *Williams v. State*, 329 Md. at 11.

21

In *Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. 293 (2009), this Court affirmed the Board of Appeals' decision denying a Baltimore County police officer's application for retirement benefits on the ground that he had not rendered "honorable and faithful service," because he had regularly used cocaine, on a recreational basis, while he was off duty. In reaching its decision, this Court quoted an earlier, unreported opinion in the same case, which discussed the meaning of the terms "honorable" and "faithful" in the relevant section of the Baltimore County Code:

> "'Honorable" carries a number of connotations, including: "performed or accompanied with marks of honor or respect," "attesting to creditable conduct[,]" "consistent with an untarnished reputation," "characterized by integrity: guided by a high sense of honor and duty." *Merriam-Webster's Collegiate Dictionary* 556 (10th ed. 2000). The definition of "faithful" includes the following: "steadfast in affection or allegiance," "firm in adherence to promises or in observance of duty," and it implies unswerving adherence to a person or thing or to the "oath or promise by which a tie was contracted."

*Id.* at 301.

In our view, these plain English terms are "understandable to a person of ordinary intelligence." *Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 592. Therefore, they give fair notice of the nature and quality of the service that members of the retirement system must give before they may obtain a pension. *See id.* For the same reason, they establish adequate standards and guidelines for the executive officers who are charged with enforcing and applying the law. *Id.* at 593 (citing *Kansas State Bd. of Healing Arts v. Acker*, 228 Kan. 145, 150 (1980), for the proposition that "professional disciplinary statutes that specify a physician's license can be revoked for

22

'unprofessional,' '*dishonorable*,' or 'immoral' conduct in the practice of medicine have 'been sustained by the courts in almost every instance'") (emphasis added).[11]

In *Brown* the Board of Appeals had originally adopted a position quite similar to the position that Captain Priester takes in this case. "The Board of Appeals was especially troubled by the absence of any definitions or standards by which to judge the critical criterion of what exactly is 'faithful and honorable' service." *Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. at 298. In fact, "because of the absence of established and official definitions and guidelines as to what constitutes 'honorable and faithful' service," the Board initially concluded that "the decision of the Retirement System," that Officer Brown had not rendered honorable and faithful service, "was *ipso facto* 'arbitrary and capricious.'" *Id.* In its unpublished opinion, this Court rejected the Board of Appeals' original decision. *Id.* at 303.

In reversing the Board of Appeals, this Court held that the Board could, but was not required to, find that the officer had failed to render honorable and faithful service even though his drug use had occurred only when he was off duty. *See id.* at 304-05. In so holding, this Court implicitly rejected the Board of Appeals' original position, that the relevant statutory language was defective "because of the absence of established and

---

[11] The familiar concept of an "honorable discharge" from military service is informative in ascertaining the meaning of "honorable service" within the contemplation of section 5-1-201(p) of the Baltimore County Code. "An honorable discharge" is "[a] formal final judgment passed by the government upon the entire military record of a soldier, and an authoritative declaration by the government that he has left the service in a status of honor." *Black's Law Dictionary* 663 (5th ed. 1979). "Full veterans benefits are given only to those with an 'honorable discharge' status." *Id.*

23

official definitions and guidelines as to what constitutes 'honorable and faithful' service." *Id.* at 298. Similarly, we reject Captain Priester's contention that the statutory language is void for vagueness because of the absence of a statutory or regulatory definition of the key terms "faithful" and "honorable."[12]

## II. The Board Did Not Apply the Code Provision in a Manner that was Inconsistent with Case Law

In *Brown* this Court recognized that the Board had to make "a judgment call" in weighing the evidence and deciding whether an employee's misconduct was sufficiently "grievous" as to be labelled dishonorable or unfaithful. *Id.* at 313. As in this case, the issue in *Brown* was not whether the employee had breached his duties, but "how serious a breach of his duty" had occurred. *Id.*

The *Brown* Court expressly recognized that the Board of Appeals would have to resolve those questions in *ad hoc* factual decisions on a case-by-case basis. *Id.* at 316. "In terms of what criminal behavior, even off-duty criminal behavior, might be considered serious enough to render the officer's service less than 'honorable and faithful,' there is, of absolute necessity, an enormous range of discretion entrusted to the

---

[12] Captain Priester also complains that neither section 5-1-201(p), nor the Retirement System's website, nor the Memorandum of Understanding between his union and the County mention that a member might forfeit his or her entire pension through dishonorable or unfaithful service. But because a member can earn pension benefits only through the requisite number of years of "membership service," which is defined as "honorable and faithful service," the statute clearly conditions the right to benefits on "honorable and faithful service." In any event, it has been established, at least since this Court's decision in *Brown* in 2009, that dishonorable or unfaithful service can lead to the forfeiture of pension benefits in their entirety. *See Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. at 304.

24

decision makers." *Id.* The Court likened the decision to "the discretionary weighing of the gravity of an offense" (*id.*), which "is something that every sentencing judge must do" in deciding between probation or imprisonment. *Id.* The Court explained:

> [A] single act of unlawfully exceeding the speed limit or a discreetly executed act of adultery (with its maximum $10 fine) could not reasonably abrogate the accrued benefits of 20 years of faithful employment. That is not to say, however, that even a single act of murder or rape or armed robbery might not so qualify, even if the public never knew that the perpetrator was a police officer. The seriousness of the crime committed is one of the infinite variables. A crime calling for a ten dollar fine is obviously not the same as a crime calling for five years of imprisonment or for life imprisonment. A single criminal act might well not be given the same weight as a dozen such acts over a period of months or a hundred such acts over a period of years. Are victimless crimes given less weight than crimes with victims? Is there a distinction between crimes of vice, crimes of violence, crimes of greed, and crimes of falsity? Does the reason for the commission of a crime make a difference? Is the stealing of a loaf of bread by Jean Valjean no different than the deliberate flouting of the law for casual amusement? All of this is obviously a part of the totality of the circumstances that must be weighed on an *ad hoc* basis. There are infinite variables and there is no way to reduce them to a predictable and easily administered matrix.

*Id.* at 317.

Captain Priester complains that because of its recognition of the necessity of *ad hoc* decision-making in the application of statutory terms to the facts of a given case, the *Brown* decision itself "hardly provides adequate notice" of what constitutes dishonorable or unfaithful service. To the contrary, *Brown* expresses the uncontroversial proposition that the Baltimore County Council cannot codify every possible application of the legal standard ("honorable and faithful conduct as an employee") to the disparate array of facts that may come before the Board. Just as a judge must exercise discretion in applying the law to the facts in deciding whether to incarcerate a defendant and (if so) for how long, so

25

too must the Board of Appeals exercise discretion in deciding whether an employee's conduct was so dishonorable or unfaithful as to result in the forfeiture of pension rights. *Id.* at 317.  Furthermore, just as a statute does not become void for vagueness merely because the legislative body allowed "'for the exercise of some discretion'" (*Finucan v. Md. Bd. of Physicians Quality Assurance*, 380 Md. at 592 (quoting *Bowers v. State*, 283 Md. at 122); *accord Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md. App. at 256-57), an agency's application of the statute does not become arbitrary and capricious merely because the agency must exercise some discretion.

Captain Priester posits a narrow reading of *Brown*, under which only "egregious and pervasive criminal misconduct integrally related to official job duties will be a sufficient basis for a complete pension forfeiture."  He distinguishes Officer Brown's violations of the criminal law from what he calls the "civil incidents" in which he was involved.[13]  He concludes that the Board "abused its discretion and acted in an arbitrary and capricious manner because it extended pension forfeiture in an unprecedented manner that is inconsistent with *Brown*."  His narrow reading of *Brown* is unjustified and unpersuasive.

---

[13] Notwithstanding Captain Priester's characterization of his conduct as noncriminal, which he repeats throughout his brief, the County argued that some of his conduct rose to the level of a second-degree assault (*see* Md. Code (2002, 2012 Repl. Vol.), § 3-203(a) of the Criminal Law Article), which includes common-law battery.  *See id.* § 3-201(b).  A battery is a touching that is either harmful, unlawful, or offensive. *Quansah v. State*, 207 Md. App. 636, 647 (2012).  Battery includes offensive touching, as well as more violent force, and "'any unlawful force used against the person of another, no matter how slight, will constitute a battery.'"  *Lamb v. State*, 93 Md. App. 422, 447 (1992) (quoting *Kellum v. State*, 223 Md. 80, 85 (1960)).

*Brown* does not state or imply that a member's service would be dishonorable or unfaithful only if he or she engaged in "egregious and pervasive *criminal* misconduct integrally related to official job duties."  (Emphasis added.)  *Brown* focused on criminal conduct because the case itself concerned whether such conduct might render an employee's service dishonorable or unfaithful even if it had no effect on job performance and occurred only when the officer was off duty.  *Brown* did not establish a floor below which an employee's misconduct could not, as a matter of law, render his or her service dishonorable or unfaithful.

In reaching its decision in this case, the Board of Appeals wrote that an "average adult citizen" would know of the "possible sanctions" that may follow from sexually harassing fellow employees, including "serious repercussions involving one's *employment status*."  (Emphasis added.)  Captain Priester interprets the Board's statement to mean that he might have been on notice that his conduct might affect his "employment status" (i.e., that he might lose his job), but not that he would lose his pension benefits.  In our view, he is interpreting the Board's conclusion too narrowly.  "Employment status" encompasses "employment rights," such as pension rights, because employees may lose their pension rights if their "employment status" comes to an end as a result of dishonorable or unfaithful conduct.  *See*, *e.g*., *Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. at 314-15.[14]

_____

[14] Unlike Captain Priester, Officer Brown was permitted to resign in lieu of being terminated for cause. *Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. at 295.

According to Captain Priester, "an average County employee" would not know that "he could lose his entire pension for engaging in rude and offensive behavior in the workplace." He asserts that it was "arbitrary, unreasonable and unsupportable" for the Board to conclude otherwise. He fails to appreciate, however, that his conduct was not merely "rude and offensive."

Captain Priester abused his status as a captain by creating a hostile and predatory environment, in which he exhibited a pattern of sexually harassing women for his amusement and the amusement of his minions. He presided over a workplace in which women were afraid to complain because they were concerned that no one would take their word over his (and that of his allies), that they would be shunned by their peers and subjected to retaliation, or that their co-workers might be ordered to withhold support from them when they were in danger. He fostered an environment in which one woman was unwilling to come to his station to train his employees because of her concern about his abusive behavior. He was responsible, as captain, for enforcing the very rules that he flagrantly violated.

In the second decade of the twenty-first century, 30 years after the Supreme Court held that "hostile environment" sexual harassment is a form of sex discrimination under Title VII of the Civil Rights Act of 1964,[15] no reasonable employee could believe that he or she could engage in a longstanding pattern of abusive misconduct such as Captain Priester's without putting pension rights at risk. The Board of Appeals, therefore, did not

---

[15] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

err in concluding that Captain Priester had adequate notice of the consequence that he suffered.

### III.     The Forfeiture of the Entire Pension is Consistent with the Code

Despite the finding that he failed to render "honorable and faithful service," Captain Priester argues that, under the "plain and unambiguous language of the most substantive and important section of the County pension statute," he is entitled to a pension.  He cites § 5-1-217(b)(1)(i)(1) of the County Code, which states, in pertinent part, that:

> a member who retires on or after January 1, 1999, shall be entitled to receive a service retirement allowance . . . upon the completion of:
>
> 1.  Twenty-five (25) years of creditable service regardless of age[.]

Citing the ALJ's opinion, Captain Priester reasons that "[t]he first instance of any alleged misconduct occurred in 'late 2010,'" which was after he had completed more than 25 years of service.  Because the record contained no direct evidence of any dishonorable or unfaithful conduct during his first 25 years of service, Captain Priester concludes that he is entitled to his pension.[16]

Captain Priester's conclusion is absurd.  Under his interpretation of the Code, he would still be entitled to his pension even if, on the day after he completed his twenty-fifth year of honorable and faithful service, he began to inflate his earnings by submitting

---

[16] In this section of his brief, Captain Priester appears to argue that he is entitled to his full pension, including the service credits that he continued to earn after his twenty-fifth year of employment, and not merely a pro-rated pension for the period before his dishonorable or unfaithful conduct was found to have occurred.

29

false claims for overtime, concealed evidence of arson in exchange for a bribe, or contributed to a co-worker's injury or death by directing his subordinates to withhold assistance from her when she was in danger. The County Code cannot reasonably be read to mean that, regardless of what he did after the twenty-fifth anniversary of his employment, Captain Priester had an indefeasible right to a pension merely because the County introduced no evidence of his misconduct in the first 25 years.[17]

Had Captain Priester retired after 25 years, before any dishonorable or unfaithful conduct occurred (or before any came to light), he would have been entitled to a pension. Captain Priester, however, chose to remain in the County's employment after the twenty-fifth anniversary of his employment. He had a financial incentive to do so, because his pension would increase by two percent of his average final compensation for each year that he remained in service after year 25 and by three percent of his average final compensation for each year that he remained after year 30. *See* Baltimore County Code § 5-1-217(b)(1)(ii)(2). By choosing to remain after 25 years, Captain Priester subjected himself to the statutory condition that he would be entitled to a pension only if, at the time of his retirement, his service had been (or had continued to be) "honorable and

---

[17] Although the department's investigation stopped as of 2010, there is little reason not to believe that Captain Priester's pattern of misconduct extended farther into the past. In his letter of remorse, he characterized himself as a practical joker who had not kept up with the times. He wrote that "[t]he Fire Department has changed drastically over these past 30 years." He referred to himself as a "[d]inosaur" and said that "the department has left [him] behind." He admitted to having failed in his "responsibility . . . to keep up with the changing times." He portrayed himself as someone who had engaged in the same conduct all along, but did not realize that it had only recently become unacceptable. Of course, his conduct was no more acceptable 30 years ago than it is today.

faithful." *See* Baltimore County Code § 5-1-201(p). Because the Board of Appeals reasonably concluded that his service was not honorable or faithful at that time, he forfeited his right to a pension.

Captain Priester responds that, even if he is not entitled to his entire pension, the Board of Appeals committed an error of law in construing the Code to mean that he must serve honorably and faithfully throughout his entire tenure in order to receive a pension. He complains that, in the Board's view, "*any* incident of dishonorable or unfaithful service, no matter how fleeting or insignificant over the course of an employee's 30-year career, could result in" the loss of the entire benefit. His argument misconstrues the concept of "honorable and faithful service," as interpreted in *Brown* and applied by the Board.

Under *Brown*, it is very clear that "fleeting or insignificant" misconduct cannot amount to dishonorable or unfaithful service. "[A] single act of unlawfully exceeding the speed limit or a discreetly executed act of adultery (with its maximum $10 fine) could not reasonably abrogate the accrued benefits of 20 years of faithful employment." *Empls.' Ret. Sys. of Baltimore Cnty. v. Brown*, 186 Md. App. at 317. "A crime calling for a ten dollar fine is obviously not the same as a crime calling for five years of imprisonment or for life imprisonment." *Id.* "A single criminal act might well not be given the same weight as a dozen such acts over a period of months or a hundred such acts over a period of years." *Id.*

Neither *Brown* nor the Board held that a single instance of trivial misconduct could put an employee's entire pension in jeopardy. To the contrary, under *Brown*,

31

employees may be divested of their pension rights only if the Board reasonably finds that they engaged in misconduct that was sufficiently serious or grievous as to taint or contaminate their entire record of service. A single incident of misconduct, if sufficiently blameworthy, might suffice to support the divestiture of pension benefits: would anyone doubt that a fire officer would forfeit a pension if he or she took a bribe in exchange for a promise to conceal evidence of an arson? On the other hand, a pattern of misconduct, such as a years-long pattern of abuse of power and authority, like the pattern that was disclosed by the evidence in this case, would support the divestiture of benefits as well.[18]

Captain Priester goes on to complain that the Board (in its words) "assumed" that if it were permissible to award a portion of the pension for the period before a member's dishonorable or unfaithful service began, the Code would have expressly said so. He argues that the Code repeatedly refers to "years of creditable service" and "years of membership service," which, in his view, suggests a statutory basis for apportionment. He recognizes, however, that the Code "relies" on those "yearly credits as a method to calculate an employee's benefit."

As we read those provisions, the yearly credits are relevant to the computation of the pension benefit for employees who have served honorably and faithfully. The

---

[18] In holding that Captain Priester had forfeited his entire pension because of his dishonorable or unfaithful conduct, the Board said that it relied on "prior Maryland cases," but it did not cite them at that point in its opinion. Captain Priester criticizes the Board for not citing the cases on which it relied. He speculates that the Board was referring to its own unpublished opinions. He questions why the Retirement System's website does not mention the prior opinions. In our view, however, it is quite clear that the Board was referring to the *Brown* decisions, which it had cited and discussed at length only two pages before.

statutory references to yearly credits do not require the Board to view an employee's serious or grievous misconduct in isolation from the rest of his or her career and to award benefits only for the period in which the misconduct did not occur. Nor do the references to yearly credits prohibit the Board from concluding that an employee's misconduct was so serious and so grievous as to require the forfeiture of the entire pension.

Finally, Captain Priester argues that the Board's decision ignores the contractual nature of pension rights as earned compensation for work performed. He asserts that forfeitures of pension rights should be "narrowly construed."

Captain Priester is correct that a pension is a form of deferred compensation – compensation earned during the time of employment, but paid after the term has ended. Pension benefits form a significant part of the total compensation package for employees of the Baltimore County Fire Department. An employer cannot divest an employee of such a pension for trivial or insignificant reasons.

But the Board was entitled to find that the misconduct in this case was neither trivial nor insignificant. It was not, as Captain Priester characterizes it, a few "instances of rude and offensive behavior committed over the last few years of employment." It involved the abuse of his authority as a captain through a discernible pattern of sexual harassment of subordinates, who were afraid to make a public complaint precisely because of Captain Priester's power and influence. It involved the violation of the rules that he, as captain, was charged with enforcing. Because honorable and faithful service is a condition precedent to a pension under the Baltimore County Code, the Board did not

33

err in holding that this dishonorable or unfaithful conduct warranted the forfeiture of

Captain Priester's pension in its entirety.[19]

## IV.    The Decision is Supported by Substantial Evidence

In his final assignment of error, Captain Priester contends that the Board lacked a

factual basis to conclude that he should forfeit his entire pension.  In view of the

deferential standard of review on such a contention, he argues that no "reasoning mind"

could conclude that he should lose his entire pension based on what he calls "non-

criminal behavior" that, he says, "had no direct impact on his service to the public" and

"covered, at most, the last 10% of his career."

In support of his contention, Captain Priester argues that he received awards and

favorable performance ratings throughout his career, that his witnesses praised his

---

[19] In its brief, the County relies extensively on a number of older cases in which an employee lost pension rights because of dishonest conduct, typically criminal in nature: *Baltimore Cnty. Bd. of Trustees v. Comes*, 247 Md. 182 (1967); *Kone v. Baltimore Cnty.*, 231 Md. 466 (1963); *Bucher v. Ober*, 204 Md. 568 (1954).  We decline to rely on those cases, in part because they concern different statutory provisions, but also because they predate the general recognition that public pension rights are contractual in nature and are not mere gratuities.  *See City of Frederick v. Quinn*, 35 Md. App. 626, 629 (1977) (stating that "a pension is more contractual than gratuitous"); *see also Bd. of Trustees of Empls.' Ret. Sys. v. Mayor & City Council of Baltimore*, 317 Md. 72, 100 (1989) ("[t]here is no doubt that, by establishing the pension systems, the City imposed contractual obligations on itself"); *Saxton v. Bd. of Trustees of Fire and Police Empls. Ret. Sys.*, 266 Md. 690, 694 (1972) (stating that "[t]he right to a pension depends upon the controlling statutory provisions and the claimant must satisfactorily perform and meet all conditions precedent").  By contrast, in 1963, the Court of Appeals wrote that the applicable provision "authorizes but does not command the giving of a pension."  *Kone v. Baltimore Cnty.*, 231 Md. at 474.  Similarly, in 1967, the Court quoted an out-of-state case for the proposition that "'[a] pension is a bounty springing from the appreciation and graciousness of the sovereign.'"  *Baltimore Cnty. Bd. of Trustees v. Comes*, 247 Md. at 187-88 (quoting *Ballurio v. Castellini*, 29 N.J. Super. 383, 389 (1954)).

firefighting and leadership skills, and that he did not commit a crime and was not charged

with a crime. He adds that his conduct did not lead to a lawsuit or a news story that cast

the County in a negative light.[20]

In our view, Captain Priester's arguments do not show that the Board was required

to rule in his favor. For the reasons that we have previously articulated at greater length,

we believe that the Board was, at the very least, equally entitled to rule against him, as it

did. Simply put, a reasoning mind could conclude that a fire officer's service was not

honorable or faithful if he was found, over the course of several years, to have abused his

---

[20] He also argues, incorrectly, that his conduct "did not constitute actionable sexual harassment." *See*, *e.g.*, *Magee v. DanSources Tech. Servs., Inc.*, 137 Md. App. 527, 561-62 (2001) (holding that female employee who complained about male supervisor's "inappropriate touching, dirty jokes during staff meetings, denigrating references to women clients and employees[,]" and sexually inappropriate and offensive remarks, and who alleged that this behavior interfered with her work, established that sexual harassment was "sufficiently severe or pervasive to be actionable"); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (holding that supervisor who frequently made sexual innuendos and proposals to a female employee, often in front of subordinates, engaged in conduct sufficiently severe and pervasive to support employee's sexual harassment claim); *Miles v. DaVita Rx, LLC*, 962 F. Supp. 2d 825, 831 (D. Md. 2013) (supervisor who made demeaning and patronizing comments to female employee, attempted to give unwanted massages, put his hand on female employee's waist, "approach[ed] her from behind and plac[ed] his mouth so close to her neck that she thought he might kiss her[,]" and positioned himself behind the employee so that when she backed out of a room her buttocks bumped against his crotch, engaged in sufficiently severe or pervasive conduct as to alter the employee's working conditions, as required to give rise to a hostile work environment claim); *Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 867-68 (D. Md. 2004) (denying defendant's motion for summary judgment with respect to hostile work environment sexual harassment claim where male supervisor kissed female employee several times, had other unwanted physical contact with her, and frequently made inappropriate sexual remarks to her).

authority by violating the rules that he was obligated to enforce and sexually harassing subordinates, who were unable to complain precisely because of his position of authority.

## CONCLUSION

We affirm the circuit court's judgment affirming the decision of the Board of Appeals.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**